**Margaret FELISKY, Plaintiff-Appellant,**

**v.**

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant–Appellee.**

No. 93–1529.

United States Court of Appeals, Sixth Circuit.

Submitted March 15, 1994.

Decided July 7, 1994.*

---

* This decision was originally issued as an "unpublished decision" filed on July 7, 1994. On September 9, 1994, the court designated the opinion as one recommended for full-text publication.

Gerald Benjamin, Levine, Benjamin, Tushman, Bratt, Jerris & Stein, Southfield, MI (briefed), for plaintiff-appellant.

Edward J. Kristof, Michael R. Mendola (briefed), Dept. of Health and Human Services, Office of Gen. Counsel, Region V, Chicago, IL, for defendant-appellee.

Before: MARTIN, RYAN, and SUHRHEINRICH, Circuit Judges.

RYAN, Circuit Judge.

Plaintiff, Margaret Felisky, applied for Social Security Disability Benefits on February 2, 1990, claiming disability as of July 18, 1988, due to pelvic and low back pain. Her application was denied initially and on reconsideration. Following an administrative hearing, the ALJ issued his decision finding Felisky not disabled. The Appeals Council denied review.

Felisky filed suit in federal district court challenging the Secretary's denial of her application for benefits. The parties filed cross-motions for summary judgment, and the district court found in favor of the Secretary and against Felisky. Felisky now appeals, raising the general issue of whether the Secretary's denial of her application is supported by substantial evidence. Specifically, Felisky raises, *inter alia*, the issues of whether the ALJ improperly rejected Felisky's testimony as not credible and whether the ALJ erred in finding that Felisky did not satisfy the standard for proving disabling pain. We find that the record does not contain substantial evidence to support the denial of Felisky's claim and reverse.

### I.

#### A. Background

We know of no way to adequately explain the reason for our decision except to review the extensive evidence produced at the administrative hearing.

Felisky was born June 22, 1937. She has a high school education and completed a college nursing program in 1972. After obtaining her R.N., she worked at the Hurley Medical Center for seventeen years. In 1978, she was promoted to head nurse for both the intensive care unit and the "step down" unit. Felisky stopped work about July 18, 1988, to undergo a urinary bladder suspension operation. On the second day after surgery, she developed severe anterior pubic pain and was diagnosed as suffering from osteitis pubis, an inflammation of the pelvic bones. She also developed lateral pelvic pain on both her left and right sides. Low back pain soon followed. Felisky attempted to return to work on January 17, 1989. She was assigned limited duties, but had to stop working on April 4, 1989, after she injured her back moving a patient. The

ALJ would later deem this to be a failed work attempt, a finding not disputed before this court.

Felisky's primary care physician appears to be Dr. Allen Stawis. Dr. Stawis has, however, referred Felisky to several other physicians in an attempt to determine the exact nature of her problem. One of these referrals was to Dr. Howard Duncan, who is the head of Henry Ford Hospital's Division of Rheumatology. On February 6, 1989, Dr. Duncan wrote a letter to Dr. Stawis detailing the results of his examination. Dr. Duncan's letter is not very helpful in determining the exact nature of Felisky's problem. He does, however, suggest various possible alternatives which could be explored to help pin down the problem. He concludes his letter by stating, "I wish we could be a little more positive in helping eradicate the problems in this patient, but at the present time I think the best we can hope for is gradual, spontaneous improvement with little help with analgesia."

Dr. Duncan's negative opinion was also shared by Dr. S. Martin, an orthopedist at the Hurley Medical Center. Dr. Martin examined Felisky several times after she sustained the back injury which forced her to stop working again on April 4, 1989. Dr. Martin opined:

> I have a very bad feeling about this lady's ability to continue to work. I wonder if due to the nature of this workman's compensation I will ever be able to get her back to work in as much as she has already been sent to see a rheumatologist in July and because she is on Coumadin. We cannot give her nonsteroidals. She already has lumbosacral corset and she states that physical therapy makes her worse and not better. I feel that I can do nothing at this time to help her.

Dr. Stawis also referred Felisky to Dr. C. William Castor, Jr. at the University of Michigan Medical Center. Dr. Castor specializes in rheumatology. On July 14, 1989, Dr. Castor wrote a letter to Dr. Stawis in which he commented on the "astounding collection of x-rays, MRIs, bone scans, etc., as well as ample laboratory studies" which Felisky brought to the examination. Dr. Castor's initial impression is that Felisky was suffering from a form of reactive arthritis resembling Reiter's.[1] Dr. Castor, however, had ordered a number of studies, which he wanted to review before reaching a definite diagnosis.

These studies apparently were not determinative because, on November 17, 1989, Dr. Castor wrote to Dr. Stawis suggesting that "we take a fresh look at [Felisky's] problem, and to that end, I have repeated some of the imaging studies done earlier for evidence of either progression or hopefully for evidence of regression or alteration of the previous findings." In that same letter, Dr. Castor noted that Felisky continued to have severe pain in her spine, in the very low sacral area, as well as the pelvis in general. Dr. Castor also noted that Felisky had indicated she was uncomfortable lying, sitting, standing, and walking.

Similar conclusions were also expressed in a letter that Dr. Stawis wrote to the employee health services at Hurley Medical Center. This letter is dated October 18, 1989, and stated that Felisky had suffered almost continuous pain in her pelvic area and lower back. Dr. Stawis noted that Felisky continued to complain of a significant amount of pain even while sitting, and that this pain had caused Felisky to become inactive. He opined, "It is my feeling that she is not physically able to work and will not be able to work until this pain can be controlled, if possible. As a result, I do not feel that any employment would be within her 'physical capabilities.'"

On January 5, 1990, Dr. Castor again examined Felisky. Dr. Castor's notes from the examination make it clear that he still had no definite diagnosis for her problems. The medical record indicates that by this point in time, Dr. Castor had become Felisky's primary care physician with respect to her low back and pelvic pain problems. Dr. Castor, however, only ordered studies and recommended treatments. Dr. Stawis implement-

---

**1.** Reiter's syndrome is a "disease of uncertain cause that is characterized by arthritis, conjunc- tivitis, and urethritis." *Webster's Medical Desk Dictionary* (1986).

ed those recommendations, and he was the one who actually prescribed the medications. In addition, Dr. Stawis continued to treat Felisky for her other problems, including obesity, essential hypertension, hyperlipidemia, hypothyroidism, and chronic venous insufficiency of her lower extremities. In a letter dated March 20, 1990, Dr. Stawis indicated:

> It is my feeling that Mrs. Felisky continues to be unable to perform any type of working duty because of her above mentioned problems. As I previously mentioned, she is unable to even perform normal household activities such as cooking and house cleaning and consequently is totally unable to be employed in any gainful occupation at this time.

The medical record also contains a March 23, 1990, letter from Dr. Neil A. Friedman, to the disability examiner of the Michigan Disability Determination Service. In reviewing Felisky's medical history, Dr. Friedman stated:

> Ms. Felisky has had extensive diagnostic testing performed. She has been seen in the Rheumatology Clinic at the University of Michigan. Apparently, no specific diagnosis has been established; however, she does have radiographic and bone scan evidence for degenerative joint disease of the lumbosacral spine. There is also radiographic evidence for osteitis pubis; and, on at least one of the three bone scans she has had, the sacro-iliac joints demonstrated increased uptake of the radioactive material. Apparently, no specific diagnosis has been firmly established. The patient states that her low back and pelvic pain is increased with any form of activity. Specifically, she stated that following trips to the Rheumatology Clinic in Ann Arbor she has increased back and pelvic pain for six to eight weeks. Her pain is also apparently aggravated by undergoing physical examinations. She is able to achieve some symptom relief with the use of narcotic analgesics or by laying supine and motionless on a firm mattress.

Dr. Friedman next details his examination of Felisky, but does not draw any conclusion from this examination about Felisky's functional capabilities.

On April 13, 1990, Dr. Stawis wrote a "To Whom It May Concern" letter, again detailing a brief history of Felisky's medical problems. In that letter, as in the March 20, 1990 letter, he states that Felisky's progress has been followed by Dr. Castor at the University of Michigan Medical Center. Dr. Stawis noted that Dr. Castor has dictated the therapy for Felisky's problems. An April 27, 1990, letter from Dr. Castor to Dr. Stawis, however, shows that Dr. Castor had still not determined the exact source of Felisky's problems:

> I had the pleasure of seeing your patient, Margaret Felisky, today, 4–27–90 in the University of Michigan Arthritis Outpatient Clinic. As you know, I have seen Mrs. Felisky a number of times since the fall of 1989 with reference to her unusual musculoskeletal complaints. These complaints of pain over the lower back, the iliac crest, the groin and the os pubis arose rather precipitously shortly after pelvic surgery related to a bladder suspension in mid 1989. The positive findings have been the finding of osteitis pubis by x-ray last summer as well as a bone scan evidence of increased uptake over not only the pubic rami but the sacroiliac joints and the iliac crest. In addition, the patient has intermittently had an elevated sedimentation rate. It is noteworthy in the history that the patient took substantial amounts of tryptophan daily for approximately two years. This was evidently discontinued in the early fall of 1989. On the strength of the resemblance of her symptoms to a reactive type arthritis, she was treated with Azulfidine 3 gm per day for several weeks and finally abandoning this program in the latter part of 1989. In addition, she received a course of antibiotics from our urologic consultants. The patient continues to be very symptomatic and certainly does not respond well to nonsteroidals such as the Voltaren which she was on until I stopped it today. She notes the painful pubic rami are slightly better but that she continues to have pain over the anterior superior iliac spine bilaterally as well as over the iliac crest. The lower

lumbosacral spine as well as the projection of the sacroiliac joints are continuously painful in varying degrees. The patient believes that these symptoms are worse on cold damp days but are better when she is supine. In addition, she notes that her strength is not up to par and that fatigue is considerably increased. Although there has been no evidence of fever, sweats or chills recently, she has had a recent increase in her sedimentation rate from previous values in the normal range to 39 at the present time. She has no known allergies to antibiotics. In view of the fact that she still has urinary urgency, there is some question as to the precise contribution which the pelvic floor may be making to the overall picture. It is my believe [sic] that the tryptophan exposure probably is not significant in view of the patient's characterization of the pain as being a deep essentially bone pain rather than the painful skin more commonly seen with the patients with the tryptophan problem. In addition it is pertinent that she apparently never had eosinophilia with the prolonged exposure to tryptophan. We have elected to have her repeat some of her base line studies today including a urinalysis and she will undertake a 30 day treatment with tetracycline 250 mg QID. If there is evidence that the urinary tract symptoms and to some extent the musculoskeletal symptoms are better towards the end of this time, we may well want to continue the program aimed at urinary antisepsis.

In addition to her examinations by Dr. Castor, Felisky was examined in September 1990 by Dr. J.W. Worthington at the Mayo Clinic. In a September 12, 1990 letter, Dr. Worthington opined:

Mrs. Felisky has a story and findings consistent with development of osteitis pubis following urinary tract surgery and consistent with the development of bilateral sacral stress fractures a short time later. The possibility of a bilateral sacroiliitis was considered, and it was noted that she is HLA–B27 positive. However, the overall pattern of the bone scans, CT scans, and pain seemed to fit best with the interpretation of stress fractures. It is anticipated that these will gradually clear and healing

of the osteitis pubis should contribute to restoring more stability in the pelvis bony structures. We strongly urged Mrs. Felisky to reduce weight, and diet instructions were given. She does have degenerative changes in the lower lumbar spine, but I did not feel that these played a major role in her chronic pelvic pain.

. . . .

Our final diagnoses included osteitis pubis, stress fractures of sacrum, obesity, hypertension, hyperlipidemia, and degenerative arthritis of lumbar spine.

Felisky continued to see Dr. Castor even after her visit to the Mayo Clinic. On September 21, 1990, Dr. Castor wrote another letter to Dr. Stawis. In this letter he states:

Her pain has persisted and has been quite debilitating. She can no longer work or even do many household chores. Even minimal ambulation is difficult because of the pain. Before the onset of this pain, she was able to walk five or six miles, work full time as head nurse in the Neurosurgical ICU in stepdown and do all of her household activities without any difficulty. She understandably finds the pain and the debilitation quite frustrating and has subsequently also gained weight since the episode. Of note is the fact that since her last clinic visit, she has been able to lose some weight.

... Today, she complained of her continued pain which was essentially unchanged from previous visits. It has not progressed to be any worse, however, it has clearly not improved at all. She also complains of being unable to raise her legs easily to climb stairs. She notes that over the last three or four years, she has had difficulty climbing stairs because of episodic numbness which she also notices when she is climbing up any sort of incline. She has had no numbness, tingling or shooting pains down to her feet. She also has fatigue and finds it very difficult to sleep at night and is sleepy during the day.

In yet another attempt to fully diagnose Felisky's problems, Dr. Castor ordered another series of tests. This new series of tests, however, while revealing several problems,

was not helpful in reaching a final diagnosis. In a letter dated November 30, 1990, Dr. Castor notes that Felisky "has been through a very thorough workup with no unifying diagnosis, which is frustrating to both ourselves and the patient." In describing the current status of Felisky's problems, Dr. Castor stated:

> She comes in for a revisit with the following complaints, mainly that her pain has been worse for the past three weeks and she cannot move around as well. She is able to control her pain with medications, including Motrin and Darvocet, which work appropriately as long [as] she does not move and lies on a couch. They do not work for her pain if she needs to move around. Otherwise her symptoms have not changed significantly. She notes no numbness and tingling in her extremities and otherwise is unchanged, although she remains quite debilitated and frustrated secondary to her inability to work.
>
> . . . .
>
> . . . Mrs. Felisky remains a very interesting patient for whom we have not found a unifying diagnosis to this point, and hope that we will do so in the future. Of importance is that she has not gotten significantly worse over the past six to eight months or so.

The final relevant letter in the Administrative Record was written from Dr. Stawis to the Employee Health Services at Hurley Medical Center on December 20, 1990. In that letter, Dr. Stawis stated:

> It is my feeling that Mrs. Felisky continues to be unable to perform any type of working duties because of her above mentioned problems. She appears to be unable to even perform normal household activities such as cooking and house cleaning and consequently is totally unable to be employed an [sic] any gainful occupation. I do not feel that rehabilitation will be of any benefit in this particular situation. I believe that she will need to remain off of work indefinitely.

As these excerpts from the Administrative Record clearly show, many doctors have made numerous efforts to determine the exact nature of Felisky's problems. By and large, these doctors have been unsuccessful. In addition, while these letters are very consistent in discussing the symptoms of Felisky's low back and pelvic pain, they are not very helpful in determining the functional limitations caused by this pain. Felisky's testimony at the hearing before the ALJ does provide some insight regarding these physical limitations. Felisky testified that she and her husband own a one-story house in Flint, Michigan. They also own a vacation home in northern Michigan, but Felisky has not been there since 1988. She is unable to garden, mow the lawn, or help with snow removal. Her husband helps her bathe and dress herself, and either he or one of their daughters prepare all of the meals. In addition, she can no longer clean the house or do laundry. She has not been in her basement for about two or two and one-half years.

Felisky has difficulty driving due to problems in lifting her legs to operate the pedals. She has driven on short trips to the grocery store or to her doctor on very infrequent occasions. Both are about ten minutes from her house. Although Felisky regularly attended church before July 1988, she rarely goes now (about twice in three years) because she is not able to stay through the mass.

Felisky also testified that she has problems writing due to arthritis in her right shoulder. When the ALJ asked her how long she could write at one time, Felisky replied, "It varies. The shoulder isn't always as bad. Sometimes I can write fifteen minutes, and other times I can't."

The pain also affects her ability to sit. In a chair "like this" she can only sit comfortably for about twenty minutes. She can sit for up to one hour in a recliner. At times, such as when she goes to the University of Michigan, she is required to sit as long as two hours. She describes these occasions as "unbearable."

Felisky testified that she stands as little as possible due to the pain. She will walk into the doctor's office and will stand while brushing her teeth, but that is about it. She can walk for less than one-half a block, and even this will take her twenty minutes.

According to Felisky, her pain is the most serious problem that prevents her from working. The pain extends throughout her low back and pelvis. The pains are constant and intense, and they radiate down the inside front of her thighs. She usually controls the pain with Darvocet–N 100, although for severe pain, she takes Tylenol 4. The pain pills are ineffective unless she lies down. Even then, the medication does not eliminate the pain, although it does make the pain bearable. Felisky takes Darvocet every three to six hours and Tylenol 4 once or twice a day. The medication upsets her stomach and makes her wary of activities such as writing checks, as she does not trust herself. In addition, many of the anti-inflammatory drugs that have been prescribed for her pelvic problems aggravate the leg pains caused by her chronic venous insufficiency. Her legs "become very, very swollen" and she suffers a "burning kind of pain."

After Felisky finished her testimony, the ALJ called Ann Tremblay, a vocational expert. Tremblay stated that, if Felisky's testimony were believed, she could do no work due to her need to lie down or sit in a recliner to relieve pain. The ALJ then posed two hypothetical questions to the VE. The VE provided the same answer to both questions. She testified that the hypothetical person posited by the ALJ would not be able to perform Felisky's past relevant work, but could perform some light and sedentary skilled work.

### B. The ALJ's Decision

The ALJ first determined that Felisky met the disability insured status requirements on July 18, 1988, her alleged onset date. He then found that she suffered from the severe impairments of degenerative disc disease of the lumbar spine, skin allergies, chronic venous insufficiency of the lower extremities, and osteitis pubis. The ALJ did not believe, however, that these impairments, either separately or in combination, were medically equal to any found in the Listing of Impairments.

The ALJ next held that Felisky's testimony was not fully credible. His only support for this finding is a blanket paragraph declaring:

> [B]ased upon an overall evaluation of the relevant written evidence of record as summarized above, the undersigned finds it does not contain the requisite clinical, diagnostic or laboratory findings to substantiate or form the underlying basis for claimant's testimony regarding totally disabling pain and other disabling impairments, certainly not to the extent as would preclude her from performing the limited ranges of sedentary and light skilled jobs the vocational expert identified at the hearing. Thus, the undersigned must conclude claimant's pain testimony at the hearing was not fully credible.

After rejecting Felisky's credibility, the ALJ determined that she possessed the residual functional capacity to perform limited amounts of light and sedentary work. Although this limited capacity rendered Felisky unable to perform her past relevant work as a registered nurse, the ALJ found that she could perform a significant number of jobs in the economy. These jobs include nursing positions in personnel records, weight loss clinics, and educational positions such as rehabilitation nursing and case management. The VE testified that approximately 10,000 of these jobs exist in the region. Accordingly, the ALJ concluded that Felisky did not meet the requirements to receive benefits.

### C. The Magistrate Judge's Report and Recommendation

Upon reviewing the parties' motions for summary judgment, the magistrate judge first determined that the ALJ improperly rejected the opinions of Felisky's treating physicians. The ALJ had ruled that these opinions were not supported by objective clinical evidence, and the magistrate judge held that this ruling was in error. The magistrate judge also found that the ALJ's hypotheticals did not take account of all the relevant medical evidence. In addition, the magistrate judge ruled that the ALJ had improperly given more weight to the opinion of a one-time examining physician than he gave to the opinion of Felisky's treating physician.

The magistrate judge also noted that the ALJ ignored the diagnosis of stress fractures made by doctors at the Mayo Clinic, and that he "ignore[d] the uniform opinion of all treating doctors who have referred to [Felisky's] 'debilitating pain.'" She also declared that this "is not a case where these physicians have just made unsupported medical assumptions, as should properly be rejected under the law of this circuit." Instead, she found that the objective medical evidence showed inflammation, prior bladder surgery, stress fractures, lupus, Reiter's syndrome, bilateral sacroiliitis, and other problems. The magistrate judge noted that Felisky's doctors have not been able to agree on a "unifying diagnosis," but determined that the doctors do not dispute that a severe problem exists. In concluding her report, the magistrate judge declared:

> For the defendant to argue that the ALJ's opinion, based on a one time medical examination, is more worthy of credence than the opinion of the treating doctors at the Mayo Clinic and the University of Michigan, where she had been followed for more than a year, is disingenuous at best.

Accordingly, she recommended that the district court grant Felisky's motion for summary judgment and deny the Secretary's motion.

### D. The District Court's Decision

In a short opinion and order, the district court rejected the magistrate judge's report and recommendation. The court noted that only Dr. Stawis had expressed any opinion regarding disability and that the other doctors found only mild abnormalities. The court also noted that the magistrate judge "relied heavily on the stress fractures identified at the Mayo Clinic. However, there is no evidence or opinion from a Mayo Clinic physician that these fractures caused disabling pain." Consequently, he found that the Secretary's denial of benefits was supported by substantial evidence.

### II.

██ Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence. Accordingly, this court's "review is limited to determining whether there is substantial evidence in the record to support the findings." *Duncan v. Secretary of Health & Human Services,* 801 F.2d 847, 851 (6th Cir.1986). "'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir.1981) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). It is for the Secretary to resolve conflicts in the evidence and to decide questions of credibility. *Gaffney v. Bowen,* 825 F.2d 98, 100 (6th Cir.1987). The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986). The substantial evidence standard presupposes that there is a "'zone of choice'" within which the Secretary may proceed without interference from the courts. *Id.* (citation omitted). If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm. *Kirk,* 667 F.2d at 535.

### III.

Felisky contends that the record does not contain substantial evidence to support the ALJ's decision. She argues that both the medical evidence and her descriptions of her daily limitations are consistent and uncontradicted. She maintains that her work record does not show her to be someone who would attempt to "escape to the disability rolls," and that her persistent attempts to obtain a diagnosis and treatment support her allegations of disability.

██ Once the Secretary finds that a plaintiff cannot perform her past work, the burden shifts to the Secretary to prove the existence of other work, which exists in significant numbers, that the plaintiff can perform. *See Price v. Heckler,* 767 F.2d 281, 284 (6th Cir.1985). If the Secretary seeks to rely on VE testimony to carry his burden of

proving the existence of a substantial number of jobs that plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes the plaintiff in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant. *Varley v. Secretary of Health & Human Services,* 820 F.2d 777, 779 (6th Cir.1987); *Bradshaw v. Heckler,* 810 F.2d 786, 790 (8th Cir.1987).

The ALJ found that Felisky could not perform her past relevant work as a registered nurse due to the lifting and bending involved in that job. Accordingly, the burden shifted to the Secretary, and the Secretary relies on the testimony of the VE to fulfill this burden. The ALJ's first question to Tremblay, the VE, asked Tremblay to assume that Felisky's testimony was credible. Tremblay testified that, based on Felisky's testimony, Felisky could do no work due to her need to lie down or sit in a recliner to relieve pain. Because the ALJ discounted Felisky's credibility, however, he did not rely on this portion of the VE's testimony. Instead, he asked Tremblay two hypothetical questions. Before reaching the issue of the sufficiency of these questions, this court must first determine whether substantial evidence exists to support the ALJ's decision to discount Felisky's credibility.

The ALJ discounted Felisky's credibility by declaring that the medical record does not support her testimony. She argues that the medical evidence is consistent and strong among all doctors who examined her. The evidence shows consistent tenderness in the sacroiliac area and limitation of spinal motion and straight leg raising. The tests and x-rays also support these findings. Felisky also contends that none of the doctors who examined her expressed any doubts about her symptoms or felt she was exaggerating her complaints. Felisky argues that the ALJ is not a medical expert and his lay interpretation of the record cannot overcome the consistent expressions of all her doctors.

Felisky also maintains that the ALJ erred in finding that she did not meet the second prong of the *Duncan* test for determining pain. That prong requires either objective medical evidence confirming the severity of the alleged pain or an objectively established medical condition that could be expected to produce the alleged disabling pain. According to Felisky, the doctors might not be able to discover exactly what is wrong with her, but the tests all show that something is seriously wrong.

The Secretary does not dispute that Felisky suffers from pain; rather, the Secretary argues that the medical record does not show that the pain is disabling. He maintains that credibility is a legal issue and the opinions of Felisky's treating doctors (or their lack of an expressed opinion) do not carry any weight. The Secretary also contends that Felisky's testimony was inconsistent in several ways.

 It is for the Secretary, not a reviewing court, to make credibility findings. *See Hardaway v. Secretary of Health & Human Services,* 823 F.2d 922, 928 (6th Cir. 1987); *Williamson v. Secretary of Health & Human Services,* 796 F.2d 146, 150 (6th Cir. 1986). If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so. *See Auer v. Secretary of Health & Human Services,* 830 F.2d 594, 595 (6th Cir.1987).

The Secretary and the ALJ have raised five different reasons to discount Felisky's credibility. The ALJ's primary reason is that the medical record does not contain sufficient objective evidence to support Felisky's subjective complaints of pain. Because this reason is intertwined with a discussion of the standards for evaluating pain, we will leave it for last.

According to the Secretary, Felisky's testimony was inconsistent because she testified that she could only sit for a maximum of twenty minutes, but later testified she could sit for two hours. The Secretary has misconstrued Felisky's testimony by taking it out of context. When asked how long she could sit, Felisky stated:

> If I had to sit in a chair like this, probably about twenty minutes. I have a, a reclining chair, and if I can sit in the reclining chair I can sit longer, like, like up

to an hour. Most of the time, I, I stay—most of the time I got [sic] to bed that's, that's the most comfortable. That relieves the pain the most. But, there are times when I have to go places, like when I have to go to the—[U of M], sometimes I have to sit as long as two hours, and the chairs are like this. And it's, you know, it's just unbearable. . . .

Clearly, this testimony is internally consistent. Felisky's ability to sit comfortably for specific periods of time depends on the type of chair she has. If necessary, she can sit for longer, but the pain becomes unbearable. Indeed, Felisky told one of her doctors that her pain is worse for several weeks after a visit to the University of Michigan. This increased pain is likely due, at least in part, to the walking and sitting she is required to do on those visits.

The Secretary also claims that Felisky is not credible because she refused to estimate her writing ability to the ALJ. This accusation is patently untrue. Felisky testified that she could not give an exact time because the length of time varied, presumably due to the severeness of the pain in her shoulder. Felisky did qualify her statement, however, by testifying that sometimes she can write for fifteen minutes and sometimes she cannot.

█ Next, both the Secretary and the ALJ declared that Felisky is not credible because her testimony and her daily activities sheets claim that she needs to lie down for the majority of the day due to pain, yet she told one of her doctors that lying down is painful. As Felisky points out, there is no discrepancy in these statements. Felisky told both the ALJ and her doctors that lying down is her *least* painful position, *not* that it is a comfortable position. In addition, Felisky told both the ALJ and her doctors that she must lie down for her pain medication to work. She takes pain medication every three to six hours.

█ The record does not refute the fourth factor that the Secretary and the ALJ use to discount Felisky's credibility. They are correct: no doctor of record has suggested that Felisky needs to lie down for the length of time she alleges. Standing alone, however,

this factor is not sufficient to discount Felisky's credibility entirely.

Finally, in discounting Felisky's credibility, both the Secretary and the ALJ rely heavily on their assertion that the medical record does not contain objective evidence to support Felisky's complaints of pain. Both the Social Security Administration and this court have enunciated guidelines for use in analyzing a claimant's subjective complaints of pain. Due to the importance of this analysis in resolving Felisky's case, we set forth these standards fully.

The pertinent SSA regulations are set out in 20 C.F.R. § 404.1529:

(a) *General.* In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. . . . However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. . . .

. . . .

(c) *Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work*—(1) *General.* When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work. . . .

(2) *Consideration of objective medical evidence.* Objective medical evidence is

evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, *we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.*

(3) *Consideration of other evidence.* Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms.... We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining or consulting physician or psychologist, and observations by our employees and other persons.... Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

(4) *How we determine the extent to which symptoms, such as pain, affect your capacity to perform basic work activities.* In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section. We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your medical history, the medical signs and laboratory findings, and statements by your treating or examining physician or psychologist or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

(Emphasis added.)

■ The Sixth Circuit has enunciated this basic standard in a more succinct form. In *Duncan,* 801 F.2d 847, this court established the following analysis for evaluating a claimant's assertions of disabling pain:

First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2)

whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Id.* at 853. As the court explicitly noted, however, this test "does not require ... 'objective evidence of the pain itself.'" *Id.* (quoting *Green v. Schweiker,* 749 F.2d 1066, 1071 (3d Cir.1984)).[2]

■ Both the SSA standards and the *Duncan* test require objective medical evidence showing an underlying medical condition. Although the Secretary does not explicitly concede that Felisky has met this requirement, he implicitly concedes that she does, and rightly so. The medical record is replete with examinations and test results showing inflammation of Felisky's pelvic bones, painful tenderness in the muscles throughout the pelvic area, degenerative joint disease, and limitations in lumbar motion.

This brings us to the second prong of the *Duncan* test, which has two parts: whether objective medical evidence confirms the severity of the alleged pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. It is important to note that these two parts are alternatives; Felisky only has to meet one of the two elements. These alternatives fit with SSA regulations, as the regulations explicitly declare that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). Instead, the SSA provides a checklist of factors which it purports to use in evaluating symptoms.

The ALJ's opinion on this issue consists largely of summaries of the various medical records and of Felisky's daily activity sheets.

After summarizing all of this information, the ALJ stated:

> [B]ased upon an overall evaluation of the relevant written evidence of record as summarized above, the undersigned finds it does not contain the requisite clinical, diagnostic or laboratory findings to substantiate or form the underlying basis for claimant's testimony regarding totally disabling pain and other disabling impairments, certainly not to the extent as would preclude her from performing the limited ranges of sedentary and light skilled jobs the vocational expert identified at the hearing. Thus, the undersigned must conclude claimant's pain testimony at the hearing was not fully credible.

Although the ALJ purports to perform an "overall evaluation of the relevant written evidence," his opinion explicitly finds only the content of the medical record insufficient to support Felisky's claims. The SSA regulations clearly state that that is not the end of the analysis. 20 C.F.R. § 404.1529(c)(2). Instead, the SSA declares it looks to several other factors. The ALJ, however, did not discuss those factors and how they relate to the evidence in this case.

We set out this list of factors above and will now review them, adding annotations to relate them to this case:

(i) **Your daily activities:** Felisky testified that she does no housekeeping, no laundry, and no cooking. She very rarely attends church and does only limited driving on infrequent occasions. She does not garden, mow the lawn, or remove snow. All of this testimony is consistent with the daily activity sheets Felisky filled out for the SSA and with her testimony regarding her pain. It is also consistent with what she told her doctors.

(ii) **The location, duration, frequency, and intensity of your pain:** Felisky testified at the hearing that her pain is located in her back and pelvic bones. The pains began shortly after her 1988 bladder oper-

---

2. Although the court in *Duncan* was in part interpreting the Social Security Disability Benefits Reform Act of 1984, which amended 42 U.S.C. § 423(d)(5)(A) and applied only to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See McCormick v. Secretary of Health & Human Services,* 861 F.2d 998, 1003 (6th Cir.1988).

ation and have continued to the present. The pains are constant and very intense like a "cancer just eating away." Pain medication reduces, but does not eliminate, the pain. This testimony is completely consistent with the information she provided to her doctors, as well as with the results of the doctors' physical examinations.

**(iii) Precipitating and aggravating factors:** At the hearing, Felisky stated that her pain is worse on cold, damp days. This is consistent with what she told her doctors. She also told her doctors that the pain increases after physical examinations and after making the trip from her home in Flint to the University of Michigan Medical Center to see Dr. Castor.

**(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms:** At the time of the hearing, Felisky used two medications to control her pain. She takes Darvocet–N 100 every three to six hours and Tylenol 4 once or twice a day. Darvocet–N 100 is prescribed for relief of mild to moderate pain. *Physicians' Desk Reference* 1216 (1994). It may impair both the mental and physical abilities required for performing potentially hazardous tasks, such as driving a car. *Id.* Tylenol 4 is prescribed for the relief of mild to moderately severe pain. *Id.* at 1365. It, too, can impair the mental and physical abilities required to perform potentially hazardous tasks. *Id.*

**(v) Treatment, other than medication, you receive or have received for relief of your pain:** The medical record reveals that Felisky's doctors have used a variety of measures to relieve her pain. Most of these measures involve various pain medications, but Dr. Martin also noted that Felisky had unsuccessfully tried a lumbosacral corset and physical therapy.

**(vi) Any measures you use or have used to relieve your pain:** The ALJ asked Felisky at the hearing what she does to relieve the pain caused by walking. Felisky replied that she lies down if possible, but if she cannot lie down she will take her pain pills and try to keep changing position.

None of these factors supports the ALJ's decision to discount Felisky's credibility.

■ In addition to these factors, the SSA indicates that it will also review the opinions and statements of the claimant's doctors. As we have stated several times, Felisky's testimony at the hearing is consistent with the information she provided to her doctors. Felisky argues that none of her doctors expressed any doubts about her symptoms or felt she was exaggerating her complaints. While the record supports this contention, the Secretary maintains that credibility is a matter for the ALJ and the fact that no doctor expressed these doubts does not carry any weight. Although the Secretary is technically correct as a matter of general principle, we do not think the general principle should apply in this specific case.

According to the Secretary, a physician's job is not to question his or her patient's statements, but is rather to match those statements with a diagnosis. Many doctors have examined Felisky over a period of years, and two doctors have examined her continuously over the past several years. These doctors are experienced in the field of rheumatology, yet they have not been able to agree on a unifying diagnosis. Surely, if they had any doubts about Felisky's credibility, some mention of it would appear in the medical record. In ruling out possibilities, the examining physicians must have ruled out the possibility that Felisky is a hypochondriac or that she is exaggerating her symptoms. In Dr. Castor's words, an "astounding collection" of tests and examinations have been performed on Felisky, and several physicians have invested great amounts of effort in attempting to identify her problems. We cannot believe that this effort would continue if they did not believe that Felisky was accurately describing her symptoms.

Substantial evidence does not exist to support the ALJ's decision to discount Felisky's credibility. Felisky has satisfied both prongs of the *Duncan* test for showing disabling pain. Although a reviewing court must give deference to the ALJ's credibility findings, the ALJ did not apply the full test set out in

20 C.F.R. § 404.1529(c) for evaluating subjective complaints of pain. A review of this full test shows that the vast majority of the factors support Felisky's complaints about her pain. Additional factors supporting Felisky's credibility are that she had a long, 17 year, work history and that her alleged disability can be traced to a specific onset date; it is not the result of a gradually worsening problem. The only factor weighing against her is that no doctor of record has stated that she must lie down for long periods of time in order to relieve her pain. This factor is legally insufficient to support a rejection of Felisky's credibility, as it does not constitute substantial evidence.

Our review of the entire record reveals that it is devoid of substantial evidence to support the ALJ's decision to discount Felisky's credibility. The VE testified that, if Felisky's testimony were believed, Felisky is completely disabled. We therefore must find that the Secretary did not carry his burden of showing that Felisky possesses the residual functional capacity to perform substantial gainful activity. Due to our resolution of this issue, we need not address the other issues raised by Felisky.

Our decision to reverse the district court raises one additional issue: whether this court should direct the district court to remand the case to the Secretary for a determination of benefits or for further consideration. The Sixth Circuit very recently enunciated the relevant standards:

> If a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.... A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking.

*Faucher v. Secretary of Health & Human Services*, 17 F.3d 171, 176 (6th Cir.1994). No factual issues remain unresolved in this case. The proof of disability is strong and there is no significant evidence to the contrary. Con-

sequently, we instruct the district court to remand for an award of benefits.

## IV.

We **REVERSE** the district court and **REMAND** with instructions for the district court to remand the case to the Secretary for an award of benefits.