Carol LADWIG, Plaintiff–Appellant,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant–
Appellee.

No. 00–6585.

United States Court of Appeals,
Sixth Circuit.

July 11, 2002.

Before BOGGS, SILER, and MOORE,
Circuit Judges.

## OPINION

MOORE, Circuit Judge.

Plaintiff–Appellant Carol Ann Ladwig ("Ladwig") appeals the district court's decision to affirm the denial by the Commissioner of Social Security ("Commissioner") of her application for Supplemental Security Income ("SSI") benefits under 42 U.S.C. § 1381. Because the Commissioner's decision was supported by substantial evidence, we **AFFIRM** the denial of benefits.

### I

Ladwig, who was born on July 9, 1945, appears to have worked fairly steadily as a licensed practical nurse until September 25, 1991. On February 24, 1995, Ladwig applied for SSI benefits, alleging that she was a recovering alcoholic and that she suffered from osteoarthritis and cervical polyps.[1] In a daily activities questionnaire, Ladwig also reported that she was emotionally unstable, having lengthy crying spells and periodic episodes of depres-

1. The polyps were successfully removed on    April 10, 1995.

sion. After the denial of her application, Ladwig requested reconsideration for the following reasons: "[B]ecause of my physical + mental limitations I am unable [to] engage in gainful employment. I have flashbacks from sexual abuse, I have dif[f]iculty sleeping + I suffer from back and leg pain. I suffer from headaches and I am a recovering drug [and] alcohol abuser." Administrative Record ("A.R.") at 85.[2] When this request was denied, Ladwig requested a hearing before an administrative law judge ("ALJ").

At the hearing on August 23, 1996, where she was represented by counsel, Ladwig testified that she had not worked for the previous fifteen years[3] because of emotional problems that ranged from self-blame for the deaths of a grandson and a long-time companion to post-traumatic stress for sexual abuse by an uncle from the time she was four to eleven years old. These emotional problems manifested themselves in the forms of (1) violent, "blinding headaches" that occurred two to three times a week and forced Ladwig to lie down for two to three hours; (2) daily crying spells that lasted up to an hour; (3) thoughts of suicide; and (4) panic attacks. A.R. at 55–57, 67. Ladwig's daughter testified that she saw her mother "[t]wo to three times a week" and that her mother cried "a good 70 percent of the time" and got agitated "[m]ost of the time" they spent together; she also testified that Ladwig had been this way for about fifteen years. A.R. at 74–76.

Directed by the ALJ to base his opinion "on what [he had] reviewed and what [he had] heard in the testimony," Dr. William U. Weiss ("Weiss"), a clinical psychologist testifying as a medical expert, identified several mental impairments, including dysthymia, mental retardation with borderline intellectual functioning, and post-traumatic stress disorder. A.R. at 60–61. Dr. Weiss observed that Dr. Randal D. France ("France"), whose report he found "most credible," had diagnosed Ladwig on September 8, 1995, as having a mild disability. A.R. at 60–61. Dr. Weiss felt that Ladwig's disability was "a little bit more severe than that, in the moderate range"; he then determined that Ladwig had "a severe disability" but one that "[did not] reach, according to the data and documentation we have here ... a level of marked disability." A.R. at 61–62.

On cross-examination, Dr. Weiss stated that from his observation at the hearing Ladwig's mental impairments "would seem to be more severe than the documentation that we have." A.R. at 63. However, referring to a daily activities questionnaire that Ladwig had completed, presumably in the spring of 1995, that "tend[ed] to suggest a reasonable level of functioning," Dr. Weiss finally concluded that "there's certainly some anxiety and mental health problems which affect functioning but not at a marked level, it's somewhat less than that." A.R. at 65–66.

The ALJ then examined a vocational expert ("VE") on "any jobs in the economy an individual with [Ladwig]'s factors could perform." A.R. at 69. The VE identified four possibilities, with approximately 38,500 positions in the State of Kentucky. The ALJ then asked whether Ladwig

**2.** Ladwig's dreams and nightmares about the sexual abuse appear to have started about the time she applied for SSI benefits.

**3.** Ladwig testified at the 1996 hearing that she had not "done any work in the last 15 years." A.R. at 48. This statement cannot be correct, inasmuch as Ladwig reported working until September 25, 1991, in her application for SSI benefits. At the time of the hearing, both the ALJ and Ladwig's attorney understood Ladwig to have done no work between 1981 and 1996. In his decision, however, the ALJ recognized that Ladwig's alleged inability to work began on September 25, 1991.

could perform those jobs, assuming that the testimony heard at the hearing "accurately reflects the level of [Ladwig's] functioning." A.R. at 70. The VE answered that Ladwig's "need to lie down two to three hours at a time, two to three days a week" and her crying spells would preclude her from working. A.R. at 70.

On September 18, 1996, the ALJ denied Ladwig's application, finding (1) that Ladwig's impairments were "severe but ... [did] not meet or equal the criteria of any of the impairments listed in [the applicable regulations]"; (2) that "[Ladwig]'s statements concerning her impairments and their impact on her ability to work are not entirely credible in light of discrepancies between [her] assertions and information contained in the [record]"; and (3) that Ladwig's inability "to perform the full range of medium work" did not mean that she was disabled, given her "capab[ility] of making an adjustment to work which exists in significant numbers in the national economy as testified to by the impartial vocational expert." A.R. at 28–29. When the Appeals Council declined to review the ALJ's determination, Ladwig filed a complaint seeking judicial review of the Commissioner's decision.

On March 28, 2000, a magistrate judge issued a report and recommendation that the denial of benefits be reversed and remanded for specific findings with respect to Ladwig's mental limitations. In particular, the magistrate judge described Dr. Weiss's testimony as equivocal and noted that "there has been no explicit or implicit credibility finding on th[e] dispositive issue" of whether Ladwig's crying spells made employment impossible. Slip Op. at 11. In objection, the Commissioner maintained that under agency guidelines Dr. Weiss had properly based his opinion on "the objective medical evidence of record" and that the ALJ's failure to discuss Ladwig's crying spells, which were not docu-mented in the medical record, "amount[ed] to no more than harmless error." On October 23, 2000, the district court granted judgment to the Commissioner. This timely appeal followed.

## II

"Our review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997) (internal citation omitted). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept [as adequate to support a conclusion]." *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir.2001) (quotation omitted). We will not reverse an ALJ's decision, "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Id.* (quotation omitted). We will therefore "not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997) (quotation omitted).

Under 42 U.S.C. § 1381, disabled individuals who meet certain income and resources requirements are entitled to SSI benefits. An individual is disabled for SSI purposes "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). "[A] physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.*

§ 1382c(a)(3)(D). The burden is on the individual to furnish evidence of the existence of a disability. *Id.* §§ 423(d)(5)(A) and 1382c(a)(3)(H)(i); *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir.1986) (requiring claimants to provide "evidence complete and detailed enough to enable the Secretary to make a disability determination"). However, in cases where the individual is determined not to be under a disability, the Commissioner must "develop a complete medical history of at least the preceding twelve months." 42 U.S.C. §§ 423(d)(5)(B) and 1382c(a)(3)(H)(i).

Section 1382c further provides:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ... [that is,] work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B). In making such a determination, the Commissioner must "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." *Id.* § 1382c(a)(3)(G). The test that governs SSI claims can be summarized as follows:

1. If an individual is working and that work is substantial gainful activity, then she is not disabled regardless of medical condition, age, education, and work experience.

2. If an individual does not have any impairment or combination of impairments that significantly limits her physical or mental ability to do basic work activities, then she does not have a severe impairment and is therefore not disabled.

3. If an individual has an impairment that meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment, then she is disabled.

4. If an impairment does not prevent an individual from doing past relevant work, then she is not disabled.

5. If, considering residual functional capacity, age, education, and past work experience, an impairment does not prevent an individual from doing other work, then she is not disabled.

20 C.F.R. § 416.920. The fifth step is at issue in this case.

## A

In applying for SSI benefits, Ladwig claimed various physical impairments, which the ALJ found "are severe but ... do not meet or equal the criteria of any of the impairments listed in [the applicable regulations]." A.R. at 28. As the Commissioner notes, Ladwig does not contest this finding. We generally deem arguments that are not briefed on appeal to have been abandoned or waived. *See, e.g., Sec. Watch, Inc. v. Sentinel Sys., Inc.,* 176 F.3d 369, 376 (6th Cir.1999), *cert. denied,* 528 U.S. 1181, 120 S.Ct. 1220, 145 L.Ed.2d 1120 (2000). In any event, the record contains two disability determinations and residual physical functional capacity assessments dated September 18, 1995, and January 4, 1996, that would constitute substantial evidence for the finding of no disability due to physical impairments.

## B

The primary question before us is whether the record contains substantial evidence to support the ALJ's finding, "[a]fter careful consideration of the entire record," that Ladwig had the severe im-

pairments of "dysthymia, anxiety and borderline intellectual functioning," which in combination with "additional non-exertional limitations" made her "unable to perform her past relevant work as nurse." but were not so severe as to render her "[in-]capable of making an adjustment to work which exists in significant numbers in the national economy." A.R. at 28–29. Because the ALJ found that Ladwig cannot work as a nurse, the Commissioner bears the burden of showing that Ladwig, "considering her age, education, and work experience, can perform other work existing in significant numbers in the national economy." *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.1999).

Ladwig argues that Dr. Weiss's "[e]quivocal testimony cannot constitute substantial evidence" of the extent to which her mental impairments limit her ability to work. Appellant's Br. at 24. However, in assessing Ladwig's "mental functioning," the ALJ relied on the evidence of record in addition to Dr. Weiss's testimony at the

1996 hearing. A.R. at 24–25. Therefore, if "the record as a whole" provides substantial evidence for the finding that Ladwig's mental impairments did not render her disabled for SSI purposes, we must affirm the denial of benefits. *See, e.g., Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 535 (6th Cir.2001).

The medical evidence of Ladwig's mental as opposed to her physical impairments is not extensive.[4] It appears that as late as April 10, 1995, Ladwig herself felt her disability to be physical. On September 8, 1995, Dr. France diagnosed Ladwig as having (1) delayed onset post-traumatic stress disorder, for sexual abuse during childhood and (2) adjustment disorder with depressed mood. As noted above, Dr. France found mild symptoms of mental impairment.[5]

After the denial of her SSI application on September 19, 1995, Ladwig was referred by her lawyer to the Western Kentucky Regional Mental Health/Mental Retardation Board, where a certified social

---

4. Dr. Weiss observed at the hearing before the ALJ that Ladwig's mental impairments seemed more severe than had been previously documented. The burden, however, was on Ladwig to produce evidence of mental impairment in the first instance and any subsequent decline. Citing *Johnson v. Secretary of Health and Human Services,* 794 F.2d 1106 (6th Cir. 1986), Ladwig now claims that the ALJ's "failure to develop the factual record fully and fairly is grounds for reversal." Appellant's Br. at 27. *Johnson,* however, relied on *Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048 (6th Cir.1983), where we criticized the ALJ for "[s]uperficial questioning of [an] inarticulate claimant[ ]" who appeared without counsel. *Lashley,* 708 F.2d at 1051–52. These considerations are not present, at least to the same degree, in this case. Ladwig was represented by counsel who cross-examined Dr. Weiss and the VE in a hearing that lasted for almost an hour.

Ladwig's condition may have further deteriorated since the hearing. On December 13, 1996, Dr. Robert George ("George") noted his

impression that Ladwig suffered from "multiple psychiatric problems," which he reiterated five months later. A.R. at 315, 329. Dr. George's notes, of course, were not before the ALJ, and thus are not "part of the record for purposes of substantial evidence review." *Foster,* 279 F.3d at 357. Furthermore, because the diagnosis is not supported by any clinical findings or documentation, it is not material and does not require us to remand this case. *See id.*

5. Dr. France gave Ladwig a rating of 70 on the Global Assessment of Functioning ("GAF") Scale, which corresponds to "[s]ome mild symptoms [of mental illness] OR some difficulty in social, occupational, or school functioning, ... but generally functioning pretty well, has some meaningful interpersonal relationships." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000). The GAF scale rates "overall psychological functioning" from 0 for inadequate information to 100 for "[s]uperior functioning." *Id.*

worker ("CSW") interviewed her on December 7, 1995, and February 28, 1996. At the initial screening, the CSW made a tentative diagnosis of adjustment disorder with depressed mood and suggested ruling out underlying dysthymia. She recommended a possible medical evaluation, noting that Ladwig felt a referral for further treatment was not necessary. The mental status checklist completed at this time indicates that Ladwig was generally normal but that she appeared worried and anxious and felt guilty.[6] At the second meeting, Ladwig reported that "she [was] dealing w[ith] her stress through exercise" and planned to "becom[e] involved again in church." A.R. at 294–95.

On April 2, 1996, Dr. Bruce Amble ("Amble"), a consulting psychologist, assessed Ladwig as having an occupational problem, a mathematics disorder, and borderline intellectual functioning. He recommended ruling out substance dependence, somatoform disorder, and malingering, and deferred making a personality diagnosis due to various problems with the validity of Ladwig's test scores. In his decision, the ALJ understood Dr. Amble to diagnose Ladwig with "moderate difficulty understanding, remembering, and carrying out complex job instructions." A.R. at 25. However, he took note of Ladwig's criticism of Dr. Amble's evaluation.

This case is somewhat complicated because Ladwig bears the burden of establishing her disability, while the Commissioner bears the burden of showing that she can still perform other work existing in significant numbers in the national economy. Under *Harmon*, the burden has shifted to the Commissioner, because of the ALJ's finding that Ladwig cannot work as a nurse. *Harmon*, 168 F.3d at 291. However, the extent of Ladwig's mental impairments, which the parties dispute, affects whether she can perform work other than nursing. In his decision, the ALJ stated that the record supported a finding of "dysthymia, anxiety and borderline intellectual functioning, impairments which cause significant vocationally relevant limitations." A.R. at 23. The ALJ then found that Ladwig's mental impairments "narrow the range of work she is capable of performing," A.R. at 27, but did not address Ladwig's headaches or crying spells, other than to find that her "statements concerning her impairments and their impact on her ability to work are not entirely credible." A.R. at 28. This language makes it difficult for us to determine the extent to which the ALJ believed the testimony of Ladwig and her daughter about Ladwig's headaches and crying spells. As Ladwig notes, we have held that "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir.1994). The ALJ did not go so far as to reject the testimony of Ladwig and her daughter. Therefore, we must look at the record as a whole to determine (1) whether Ladwig has satisfied her burden of proving that she is severely impaired by headaches and crying spells and (2) whether the Commissioner has shown that Ladwig can still perform work other than nursing that exists in significant numbers in the national economy.

■ The Commissioner correctly notes that Ladwig's otherwise extensive medical record contains very little evidence of crying spells.[7] There are two notations be-

---

6. A psychiatric review conducted by Dr. Ann L. Hess on December 26, 1995, found that Ladwig had affective, anxiety-related, and substance addiction disorders but that Ladwig's impairments were not severe.

7. The evidence with respect to headaches is similarly sparse. Because Ladwig does not address the issue of headaches in her brief, we will consider it to have been waived.

tween July 15 and August 16, 1990, that Ladwig cried during a medical examination, but these incidents coincided with multiple personal tragedies that befell Ladwig during that time. Since then, various doctors have found her to be anxious. However, the record does not indicate any crying spells other than the two incidents in 1990. Therefore, the ALJ did not err in discrediting the testimony of Ladwig and her daughter. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir.1983) ("Perceptible weight must be given to lay testimony where ... it is fully supported by the reports of the treating physicians."). Given the lack of objective medical evidence about Ladwig's crying spells, we accept the ALJ's implicit conclusion to the contrary.

■ Finally, we hold that the Commissioner has carried the burden of proving that Ladwig is not disabled for SSI purposes. The following test governs this determination:

> If the Secretary seeks to rely on VE testimony to carry his burden of proving the existence of a substantial number of jobs that plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes the plaintiff in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant.

*Felisky*, 35 F.3d at 1035–36. The ALJ posed two hypothetical questions to the VE. The first concerned "non-exertional mental limitations," which the VE stated would not preclude Ladwig from working as a janitor, machine operator, hotel maid, or packager. A.R. at 69. The ALJ then asked the following hypothetical question: "Assuming I find that the testimony we've heard today accurately reflects the level of functioning of [Ladwig], could she perform the medium and light jobs you just identified?" A.R. at 70. The VE answered that Ladwig could not, because her headaches and crying spells "would probably remove her from the job for those time periods." A.R. at 70. When asked specifically about Ladwig's mental impairments, the VE answered that "anything is possible" and that, in her experience, "people [who] have a combination of moderate marking [sic] ... are still able to function in a low stress, one to two step, simple instruction type of job." A.R. at 73. We have previously determined that the ALJ did not err in discrediting the testimony of Ladwig and her daughter about Ladwig's alleged crying spells. Therefore, the second hypothetical question as initially understood by the VE did not accurately describe Ladwig, and the VE's response to the ALJ's first hypothetical question constitutes substantial evidence under *Felisky*.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision to affirm the denial of benefits.