**Everett FLETCHER, Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant.**

Case No. 3:12–cv–321.

United States District Court, S.D. Ohio, Western Division.

Signed March 26, 2014.

Stephanie D. Dobson, Horenstein, Nicholson & Blumenthal, Dayton, OH, for Plaintiff.

John J. Stark, US Attorney Office, Columbus, OH, Kiywhanna Lachic Kellup, Social Security Administration Office of General Counsel, Chicago, IL, for Defendant.

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IS REVERSED; AND (2) JUDGMENT BE ENTERED IN FAVOR OF PLAINTIFF AWARDING BENEFITS**

TIMOTHY S. BLACK, District Judge.

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore unentitled to disability insurance benefits ("DIB") or social security income ("SSI") for the period from December 2, 2004 until January 31, 2011. (*See* Administrative Transcript ("Tr.") (Tr. 603–18) (ALJ's decision)).

**I.**

On November 14, 2001, Plaintiff Everett Fletcher filed an application for DIB alleging disability beginning June 4, 2001. (Tr. 40). The claim was ultimately denied by ALJ Thomas McNichols on December 1, 2004. (Tr. 37–50). The Appeals Council denied review on May 3, 2005. (Tr. 37–50, 56–68).

On January 14, 2005, Plaintiff filed applications for DIB and SSI alleging disability beginning June 4, 2001. (Tr. 71, 489). The claims were denied initially and upon reconsideration. (Tr. 59, 63, 492, 496). Plaintiff timely requested a hearing. (Tr. 66). A hearing was held before ALJ Thaddeus Armstead on May 22, 2008. (Tr. 554–97). Declining to reopen or revise the first decision by ALJ McNichols, ALJ Armstead limited the time period before him to December 2, 2004 through the date of his decision. (Tr. 13). ALJ Armstead denied Plaintiff's claims on September 24, 2008. (Tr. 10–26). The Appeals Council denied review on June 29, 2010. (Tr. 6–9). Plaintiff commenced an action in federal court pursuant to 42 U.S.C. §§ 405(g) and 1383 for judicial review of the Commissioner's decision, which was vacated and remanded for further administrative proceedings pursuant to Sentence Four of § 405(g). (Tr. 636).

A hearing was held before ALJ McNichols on June 14, 2012. (Tr. 650). The ALJ issued a partially favorable decision on June 23, 2012, finding that Plaintiff was not disabled prior to January 31, 2011, but became disabled on that date pursuant to Medical–Vocational Rule 202.01 and had continued to be disabled through the date of that decision. (Tr. 617).

Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision, again pursuant to 42 U.S.C. § 405(g).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant met the insured status requirements of the Social Security Act through June 30, 2006.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. Since the alleged onset date of disability, December 2, 2004, the claimant has the following severe impairments: chronic low back pain status post two surgeries (2005 and 2012); COPD; borderline intellectual functioning; history of developmental disorder and reading disorder; and depression (20 CFR 404.1520(c) and 416.920(c)).

4. Since the alleged onset date of disability, December 2, 2004, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that, since December 2, 2004, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following limitations: occasional climbing stairs and ramps; no climbing ropes, ladders, or scaffolds; occasional stooping, kneeling, crouching, or crawling; no exposure to temperature extremes or concentrated amounts of irritants; must have the opportunity to alternate between sitting and standing at 30–minute intervals; occasional work above shoulder level; no complex or detailed instructions; only simple, one-or two-step tasks requiring little, if any, concentration; no reading; and no jobs requiring more than simple math tasks.

6. Since December 2, 2004, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Prior to the established disability onset date, the claimant was an individual "closely approaching advanced age." On January 31, 2011, the claimant's age category changed to an individual of "advanced age" (20 CFR 404.1563 and 416.963).

8. The claimant has a "limited" education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Prior to January 31, 2011, the date the claimant's age category changed, considering his age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. Beginning January 31, 2011, the date the claimant's age category changed, considering his age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. The claimant was not disabled prior to January 31, 2011, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

13. The claimant was not under a disability within the meaning of the Social Security Act at any time through June 30, 2006, the date last insured (20 CFR 404.315(a) and 404.320(b)).

(Tr. 603–18).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations prior to January 31, 2011, and, therefore, was not entitled to DIB or SSI prior to that date. (Tr. 617).

On appeal, Plaintiff argues that: (1) the ALJ failed to properly evaluate the psychological evidence of record by finding no significant change in Plaintiff's mental impairments since the prior ALJ decision; (2) the ALJ erred by failing to find Plaintiff's cervical pathology constituted a severe impairment; and (3) the ALJ erred by failing to properly evaluate the treating physician opinion of Dr. Smith.

The Court will address each alleged error in turn.

## II.

■■■ The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir.1978). If substantial evi-

dence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

"The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen,* 35 F.3d 1027, 1035 (6th Cir.1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:

Plaintiff was 56 years old at the time of ALJ McNichols's second decision, a person of advanced age in the eyes of Social Security. (Tr. 615). Plaintiff attended school through the 10th grade, was classified as a slow learner, and received special education services. (Tr. 188).

Plaintiff experienced symptoms of numbness and tingling in both the upper and lower extremities for a number of years. (Tr. 165, 324). An EMG of the lower extremities in February 2004, how-

ever, was negative. (Tr. 323). An EMG of the upper extremities in December 2003 showed abnormalities suggestive of a probable right C7 radiculopathy and probable left C6 and C7 radiculopathy. (Tr. 328). The findings were considered moderate in severity. (*Id.*)

Plaintiff was sent for a cervical MRI in August 2004, which showed a small disc herniation at C3–4, a small focal disc herniation at C4–5 with possible contact with the cord, a small central disc herniation at C5–6, and some mild degenerative changes at C6–7. (Tr. 370). A lumbar spine MRI completed in September 2004 showed severe central canal stenosis at L4–5 secondary to a broad-based large disc herniation and prominent ligamentum hypertrophy. (Tr. 365). Based on the MRIs, Plaintiff's primary care physician (intern), Valentino Serio, D.O., completed an assessment of Plaintiff's functional capacity. (Tr. 363). Dr. Serio thought that Plaintiff could lift up to 20 pounds occasionally or five pounds frequently, walk for up to four hours a day, and sit up to four hours a day, but that he could not maintain any one position for more than one to two hours at a time. (*Id.*)

Plaintiff was evaluated by Scott C. West, D.O., in January 2005. (Tr. 267). He reported low back pain with radiations into his hips and buttocks, a burning sensation throughout his legs, and numbness in his feet. (*Id.*) On examination, Dr. West noted palpable tenderness in the lower lumbar region. (*Id.*) Range of motion was decreased. There was some weakness in the extensor hallucis longus muscle bilaterally. (*Id.*) Straight leg raising test was positive at 40 degrees bilaterally. (*Id.*) Dr. West felt that Plaintiff's clinical signs were consistent with his MRI study. (*Id.*) Dr. West recommended that a surgical fixation of the lumbar spine with a very large pedicle screw fixation at the L4–5 level

was indicated, but because this was very extensive surgery, he recommended it only as a "last option." (Tr. 268). He referred Plaintiff for physical therapy. (*Id.*) Plaintiff underwent physical therapy for about a month. (Tr. 171–77). By discharge he had been unable to meet his goal of decreasing his pain and his gait was slow and antalgic. (Tr. 171).

A State agency physician reviewed the file in April 2005. (Tr. 180–87). The reviewing physician thought that Plaintiff could perform light work exertionally with postural activities limited to occasional. (Tr. 181–82).

Plaintiff followed up with Dr. West in early April 2005, who noted that physical therapy had not improved his pain. After further consideration, Plaintiff felt he would like to undergo the spinal fusion. (Tr. 263–64). The surgery was performed on August 25, 2005. (Tr. 206–08). Plaintiff had good initial improvement in his symptoms from his surgery, with resolution of his lower extremity pain. (Tr. 261). X-rays showed satisfactory alignment of the fusion. (Tr. 59). By March 2006, Dr. West felt that Plaintiff could be seen on an as needed basis. (Tr. 259).

Plaintiff continued to be followed at the Cassano Clinic. (Tr. 334–85). In April 2006, he was seen by Staci Smith, D.O. (Tr. 343). In October 2006, Plaintiff reported to Dr. Smith that his pain was controlled with Darvocet, though he continued to have chronic low back pain. (Tr. 341). Plaintiff was seen for pain management at Prime Health Medical Services from February through November 2007, where he received additional physical therapy. (Tr. 274–319). Even during this treatment, Plaintiff experienced intermittent tingling and numbness in his arms and hands. (Tr. 284).

In March 2007, Dr. Gomaa ordered an MRI of the cervical spine, which showed

annulus disc bulging from C3 through C7. (Tr. 298). An MRI of the lumbar spine completed on the same date demonstrated a previous laminectomy and fusion involving L4 and L5. (*Id.*) There was also an annular disc bulge at L3–4 and L4–5, with facet arthropathy at L5–S 1. (Tr. 299). In October 2007, Plaintiff reported to Dr. Smith that Darvocet decreased his pain to a 3/5. (Tr. 337). His Neurontin was increased, and it was noted that Plaintiff might need a referral to pain management, which was done in December 2007. (Tr. 335–36).

Plaintiff began physical therapy late December. (Tr. 448–54). In January 2008, he was evaluated by Nadeem Ahmed, M.D., for possible pain management. (Tr. 464–67). Plaintiff reported that, while the surgery greatly relieved his leg weakness, he continued to have back pain with symptoms of burning and pain in both thighs. (Tr. 465). Examination showed a slight weakness on the right when compared to the left lower extremity. (*Id.*) There was also some midline tenderness in the lumbosacral region. (*Id.*) Straight leg raising was slightly positive at about 80–85 degrees in a sitting position. (Tr. 466). Dr. Ahmed thought that Plaintiff was a good candidate for epidural steroid injections, but Plaintiff was not inclined toward injectable therapies. (*Id.*) Dr. Ahmed felt that Plaintiff's medication, three Vicodin a day, was appropriate and could be continued by Dr. Smith. (*Id.*) He also recommended continued physical therapy. (*Id.*) Plaintiff continued physical therapy through mid-January 2008, meeting all goals except for pain reduction. (Tr. 479–88).

A State agency physician reviewed the file on February 13, 2008. (Tr. 455–62). The reviewing physician thought that Plaintiff could perform light work exertionally. (Tr. 456).

Dr. Smith sent Plaintiff for another cervical spine MRI on February 18, 2008. Broad-based disc herniations were seen at C4–C5, C5–C6 and C6–C7. (Tr. 468). By March 2008, Plaintiff was reporting chronic neck pain to Dr. Smith. (Tr. 470). In April 2008, Dr. Smith completed an assessment of Plaintiff's ability to function in the workplace. (Tr. 471–78). Dr. Smith indicated that due to Plaintiff's disc herniations and chronic pain, he would have difficulty withstanding the pressure of meeting normal standards of work productivity and work accuracy. Dr. Smith opined that Plaintiff would have difficulty completing a normal work day and work week because he would need rest due to his chronic neck and low back pain. (Tr. 173). Dr. Smith did not think that Plaintiff should lift more than ten pounds occasionally or five pounds frequently, stand/walk for more than one hour in an eight-hour work day, or sit for more than two hours in an eight-hour work day. Dr. Smith indicated that Plaintiff should only occasionally climb, stoop, crouch, or kneel and should never crawl. (Tr. 475). Dr. Smith also felt that Plaintiff's ability to reach, handle, and push/pull would be affected. (Tr. 476). Dr. Smith did not think that Plaintiff could perform even sedentary work on a sustained basis. (Tr. 478).

In addition to his physical problems, Plaintiff has had problems with his cognitive and emotional functioning. He was evaluated by MaryAnn Jones, Ph.D., on August 4, 2005, at the request of the State agency. (Tr. 188–94). He was given a Wechsler Adult Intelligence Scale (WAIS)—III on which he achieved a full-scale IQ score of 68. Dr. Jones noted that this score fell within the mild range of mental retardation. The Wechsler Memory Scale (WMS)—III showed scores ranging from 66–68, all of which were in the mild range of mental retardation. Dr.

Jones thought that these scores were "somewhat of an underestimate of his general intellectual ability, and it was thought that he is more accurately functioning in the borderline range." (Tr. 191). She acknowledged, however, that Plaintiff's memory skills fell at the mentally retarded range, and that he was functionally illiterate. (*Id.*)

Dr. Jones also noted that, in addition to Plaintiff's cognitive difficulties, he had a Pain Disorder with Psychological and Medical Features along with a Developmental Reading Disorder. (Tr. 192). On mental status examination, she noted that Plaintiff's presenting demeanor was resigned and dysphoric and his affect ranged from sad to blunted. Dr. Jones noted that Plaintiff was somewhat preoccupied with his own symptomatology and he showed some degree of confusion. (Tr. 189). He had difficulty following through with tasks after initial directions as he presented as somewhat distracted. Dr. Jones thought that Plaintiff's ability to relate to others was moderately impaired by his pain symptoms and cognitive limitations. "It is unlikely he would be able to relate sufficiently to coworkers and supervisors—on any sustained basis (for 2 hours or more at a time)—in order to perform simple, repetitive tasks." (Tr. 192). Dr. Jones noted that Plaintiff would be limited to simple, routine tasks. (*Id.*) Dr. Jones also noted that Plaintiff was moderately impaired in his ability to withstand the stress and pressures associated with day-to-day work activity. (Tr. 193).

A State agency psychologist, Audrey Todd, Ph.D., reviewed the file in October 2005. (Tr. 227). She opined that Plaintiff had a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 237). From a purely psychological standpoint, Dr. Todd concluded that Plaintiff could "complete one-and two-step tasks in a routine setting without strict production quotas, extensive interpersonal interaction, or undue change. (Tr. 244).

Plaintiff began treatment at DayMont West in March 2006. (Tr. 436–47). On initial examination, he presented as somewhat withdrawn and his speech was slurred. He had some suicidal ideation. His thought processes were circumstantial and concrete. His mood was depressed and his affect was flat. His memory showed some impairment and his intellectual functioning was estimated as borderline. (Tr. 447). He reported seeing shadows and hearing noises in his home. (Tr. 442). He was diagnosed with major depression with mild psychotic features and assigned a Global Assessment Functioning ("GAF") score of 51.[1] (Tr. 445). Plaintiff was seen by the staff psychiatrist, Leena M. Sumitra, M.D., in June 2006 where a diagnosis of depression was confirmed with a GAF of 60. He was started on Lexapro for the depression and Risperdal for some psychotic features. (Tr. 434).

Plaintiff continued to be seen for therapy and medication management. (Tr. 386–430). By July 2006, Plaintiff reported the medication was helping him feel less depressed and there was a decrease in his auditory and visual hallucinations. (Tr. 424). Medications did require some ad-

---

**1.** The GAF scale reflects the "clinician's judgment" about an individual's psychological functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32–33 (4th ed., Text Rev. 2000) ("DSM–IV–TR"). A GAF score of 51–60 indicates that the individual has moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 34. In most instances, ratings on the GAF Scale are for the current period (*i.e.,* at the time of evaluation). *Id.*

justments over time. (Tr. 395). Therapy helped Plaintiff to address his anger issues. (Tr. 392).

Dr. Knight, a treating psychiatrist at DayMont, completed a basic medical form for the Ohio Department of Jobs and Family Services on November 3, 2008. (Tr. 691). He opined that Plaintiff would be markedly limited in the following areas: ability to respond appropriately to criticism; ability to maintain attention and concentration for extended periods; ability to carry out detailed instructions; and ability to remember locations and work-like procedures. (*Id.*) He opined that Plaintiff had moderate limitations in most other functional areas, including understanding, memory, social interaction, and adaptation. (*Id.*) Dr. Knight diagnosed Plaintiff with bipolar disorder, mixed with psychosis, and reported that Plaintiff suffered from a history of mood swings, paranoia, and anxiety at time. (Tr. 692).

Plaintiff continued treatment at Day-Mont West in late 2008 with Dr. Knight and therapist Betty Gilbert. He reported continuing to hear voices in early 2009. (Tr. 821, 813). In an adult diagnostic assessment update on April 29, 2010, the diagnosis was major depressive disorder, recurrent, with a GAF of 50.[2] (Tr. 792). In a subsequent update on July 12, 2010, the diagnosis was major depressive disorder, recurrent, and intermittent explosive disorder, with an assigned GAF of 45. (Tr. 787). On December 28, 2010, Plaintiff reported a decrease in his anger episodes; however he was having problems with low energy, lack of motivation, and feeling less than others. (Tr. 779). On January 1, 2011, Plaintiff reported feelings of sadness, depressed mood, and anger outbursts.

(Tr. 778). On September 27, 2011, Plaintiff told Dr. Knight that he was doing fine with no mood swings, he was going fishing, going to movies, and "getting along ok with lady friend." (Tr. 763). Plaintiff began seeing Dr. Harris on April 19, 2012, at which time he reported doing well. (Tr. 746). His mood was euthymic with full affect and logical thought process. (Tr. 746–47). Dr. Harris listed Plaintiff's diagnosis as major depressive disorder, recurrent, severe with psychotic features, and assigned a GAF of 65. (Tr. 750).

Plaintiff returned to Dr. West on February 1, 2012 for complaints of low back pain with radiation into his hips and buttocks bilaterally. (Tr. 712). Plaintiff reported that he did very well after his spinal fusion, however his pain gradually increased over the last two years. (*Id.*) Dr. West reviewed an updated lumbar MRI, completed on January 25, 2012, revealing severe spinal stenosis at the L3–4 level with foraminal narrowing and slight spondylolisthesis of L3–4. (*Id.*) Dr. West discussed several options with Plaintiff, including physical therapy, lumbar epidural blocks, or an extension of his lumbar fusion. (Tr. 693, 713). Plaintiff ultimately decided to proceed with surgical intervention and underwent a lumbar laminectomy at the L3–4 level with fusion on March 26, 2012. (Tr. 711, 702). Dr. West saw Plaintiff in follow-up on April 11, 2012, at which time Plaintiff was doing well with relief of his leg pain and numbness. (Tr. 710). Dr. West completed a medical assessment on April 16, 2012, less than one month post-surgery. (Tr. 714–18). He limited Plaintiff to lifting no more than two pounds, standing/walking no more than four hours total in an eight hour work day, and sitting

---

2. A GAF score of 41–50 indicates that the individual has serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in so-cial, occupational, or school functioning (*e.g.,* no friends, unable to keep a job, cannot work). DSMIV–TR at 34.

no more than three hours in an eight hour work day. (Tr. 715).

Plaintiff presented to the hearing with a walker. (Tr. 855). He testified that he had recently undergone his second back surgery, however it was too soon to tell if this surgery was helpful. (Tr. 853). He testified that his depression "makes me don't want to live." (Tr. 857). He had been treated at DayMont West for approximately two or three years and was seeing a counselor weekly. (*Id.*) He testified that he has suffered from back pain since 2001. (Tr. 860). The pain is constant, every day. (*Id.*) Pain medication helps him "get around a little" but the pain is still present. (Tr. 861). He testified that his arms go numb and he drops things daily. (Tr. 853, 862, 869). His neck continues to be "stiff and sore" and he has difficulty looking side-to-side. (Tr. 870–71).

### B.

First, Plaintiff argues that the ALJ failed to properly evaluate the psychological evidence of record by finding no significant change in Plaintiff's mental impairments since the prior ALJ decision. (Doc. 7 at 14).

Under *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir.1997), "the principles of *res judicata* can be applied against the Commissioner. When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* "Absent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id.* ALJ McNichols claimed that Plaintiff's mental status had not declined since December 2004 but had shown signs of improvement. (Tr. 612). Consequently, under *Drummond,* he found that it was reasonable to continue the restriction to simple work identified in the prior ALJ decision. (*Id.*)

Contrary to the ALJ's findings, Plaintiff's psychological condition has deteriorated significantly since the prior ALJ decision. A review of the prior decision reveals that the only evidence related Plaintiff's mental health was a consultative psychological assessment by Floyd Sours, M.A. (Tr. 51). Mr. Sours' evaluation revealed no evidence of depression or a pain disorder. (Tr. 43). This is in contrast to the evaluation by Dr. Jones in 2005, whose evaluation revealed a pain disorder with psychological and medical features. (Tr. 192). In March 2006, when Plaintiff began treatment at the mental health center, he showed clear signs of depression with some psychotic features. (Tr. 446). Notably, the ALJ's decision tacitly admits there was a decline in Plaintiff's mental health. Whereas the ALJ's prior decision from 2004 found only borderline intellectual functioning as a severe impairment, ALJ McNichols also found depression to be a severe impairment in 2012. (Tr. 606).

Furthermore, Plaintiff's former treating psychiatrist, Dr. Knight, completed a mental assessment in November 2008, in which he opined that Plaintiff would be markedly limited in his ability to respond appropriately to criticism; maintain attention and concentration for extended periods; carry out detailed instructions; and remember locations and work-like procedures. (*Id.*) He opined that Plaintiff had moderate limitations in most other functional areas, including understanding, memory, social interaction, and adaptation. (*Id.*) Dr. Knight identified Plaintiff's impairments to be bipolar disorder, mixed with psychosis. (Tr. 692). He noted that Plaintiff has a history of mood swings, paranoia, and anxiety, with some memory and focus deficits at times. (*Id.*) More recent treatment notes

827

from DayMont West confirm ongoing diagnoses of major depressive disorder, and recurrent and intermittent explosive disorder. (Tr. 787, 792). Plaintiff was reporting problems with low energy, lack of motivation, feeling less than others, sadness, depressed mood, and anger outbursts at times. (Tr. 778–79). The last psychiatric progress note from Dr. Harris listed Plaintiff's diagnosis as major depressive disorder, recurrent, severe with psychotic features, and assigned a GAF of 65. (Tr. 750).

While the most recent treatment notes do reflect some improvement, the question is whether Plaintiff's mental health has declined on the whole since 2004, at which time the only severe impairment was borderline intellectual functioning. The evidence of record demonstrates that the answer to this question is yes, unequivocally.

Accordingly, the ALJ's finding concerning Plaintiff's mental residual functional capacity ("RFC") is unsupported, as there is substantial evidence that Plaintiff's mental condition has become significantly more disabling since 2004.

## C.

Next, Plaintiff argues that the ALJ erred by failing to find Plaintiff's cervical pathology constituted a severe impairment. (Doc. 7 at 16).

■ At step two of the sequential analysis, an ALJ determines whether a claimant's impairment(s), individually or in combination, are severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The

regulations do not require the ALJ to designate each impairment as "severe" or "non-severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Rather, the severity standard at step two is a threshold inquiry, and as long as a claimant has at least one severe impairment, or combination of impairments, the ALJ must proceed beyond step two and consider all impairments at the remaining steps of the evaluation process. 20 C.F.R. § 404.1523. Thus, if the ALJ finds that a claimant has at least one severe impairment, the only remaining issue is what limitations, if any, result from the impairment. *See Fisk v. Astrue*, 253 Fed.Appx. 580, 583 (6th Cir.2007) ("When an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error"). In this case, the ALJ found that Plaintiff had several severe impairments, and then appropriately proceeded through the sequential analysis.

■ Plaintiff contends that the ALJ included "no discussion whatsoever of [his] alleged neck and upper extremity limitations in his analysis of his severe impairments at Step 3." (Doc. 7 at 16).[3] Not only did the ALJ discuss Plaintiff's cervical impairment, but he accommodated Plaintiff's condition by incorporating specific limitations in his RFC. Between steps three and four, the ALJ discussed the medical evidence, and how it related to Plaintiff's ability to work. In that discussion, the ALJ explained that Dr. West reported that

3. Although Plaintiff states that the ALJ did not discuss his impairment at step three, it appears as if Plaintiff intended to challenge the ALJ's step-two finding. (Doc. 7 at 16). The ALJ provided a detailed analysis of Plaintiff's physical impairments throughout the sequential evaluation. The ALJ explained that Plaintiff's lumbar impairment did not satisfy the requirements of any impairment described in section 1.00 of Appendix 1, Subpart P, Regulations No. 4. (Tr. 607). Since the ALJ did not find that Plaintiff's neck impairment was severe, it is not surprising that he did not discuss whether the impairment met or equaled a listed impairment.

a cervical MRI scan performed on June 24, 2004 revealed very small disc herniations, but no stenosis. (Tr. 611, 267). The ALJ went on to explicitly note that "given the mild cervical degenerative disc disease reported by Dr. West, it is reasonable to limit the claimant's overhead reaching to no more than occasional as this activity can aggravate the claimant's neck condition if performed on a frequent or repetitive basis." (Tr. 612).

Plaintiff suggests that the ALJ should have found additional limitations because he testified that he dropped things and had difficulty looking from side to side. (Doc. 7 at 17; Tr. 853, 862, 869, 871). However, Plaintiff also he admitted that he was driving on a daily basis up to three months before the hearing. (Tr. 850). Similarly, Plaintiff's claim that he had difficulties using his hands is at odds with other parts of the record. In February 2011, Plaintiff told his counselor that he was working on his car. (Tr. 775). In May 2011, Plaintiff reported that he was starting a vegetable garden and going fishing. (Tr. 771). Four months later, Plaintiff reported that he was still fishing. (Tr. 763). By November 2011, Plaintiff was making preparations to help his sister cook Thanksgiving dinner. (Tr. 759). More importantly, Dr. West, Plaintiff's surgeon, indicated that Plaintiff's conditions did not cause problems handling, fingering or feeling objects. (Tr. 716).

In light of this evidence, it was reasonable for the ALJ to conclude that Plaintiff's cervical pathology did not constitute a severe impairment.

**D.**

Finally, Plaintiff argues that the ALJ erred by failing to properly evaluate the opinion from Plaintiff's treating physician, Dr. Smith.

A treating source opinion is entitled to controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927. If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ must give a specific good reason for rejecting the opinion of a treating physician. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 245–246 (2007). A broad assertion that the opinion was not supported by the record is inadequate. *Id.*

In April 2008, Dr. Smith completed an assessment of Plaintiff's ability to function in the workplace. (Tr. 471–78). Dr. Smith indicated that due to his disc herniations and chronic pain, Plaintiff would have difficulty withstanding the pressure of meeting normal standards of work productivity and work accuracy. Further, Dr. Smith noted that Plaintiff would have difficulty completing a normal workday and workweek because he would need rest due to his chronic neck and low back pain. (Tr. 173). Dr. Smith did not think that Plaintiff should lift more than ten pounds occasionally or five pounds frequently, stand or walk for more than one hour in an eight-hour work day, or sit for more than two hours in an eight-hour work day. (Tr. 474). Dr. Smith indicated that Plaintiff should only occasionally climb, stoop, crouch, or kneel and should never crawl.

(Tr. 475). Dr. Smith also felt that Plaintiff's ability to reach, handle, and push/pull would be affected. (Tr. 476). Dr. Smith did not think that Plaintiff could perform even sedentary work on a sustained basis. (Tr. 478).

The ALJ rejected this opinion, finding that it was not well-supported by the evidence of record and was "not entitled to controlling, deferential, or even significant adjudicative weight." (Tr. 615). The ALJ went on to find: "[Dr. Smith's] opinion conflicts with Social Security case law as the record does not show a significant change in the nature, character, or severity of the claimant's condition that would permit a significant deviation from the findings established in the prior decision." (*Id.*)

However, the record contains substantial evidence of deterioration in Plaintiff's physical condition, consistent with the limitations set forth in Dr. Smith's opinion. ALJ McNichols's decision in 2004 did not find any severe physical impairments. (Tr. 49). Indeed, the most significant problem in 2004 and before appeared to be Plaintiff's breathing problems. (Tr. 42). The current record documents increasing difficulties with back and neck pain and problems with numbness and tingling in the extremities.

An EMG of the upper extremities in December 2003 showed abnormalities suggestive of a probable right C7 radiculopathy and a probable left C6 and C7 radiculopathy. The findings were considered moderate in severity. (Tr. 328). This EMG was not addressed in the prior decision. A cervical MRI showed a small disc herniation at C3–4, a small focal disc herniation at C4–5 with possible contact with the cord, a small central disc herniation at C5–6, and some mild degenerative changes at C6–7. (Tr. 370). More significantly, an MRI of the lumbar spine in September 2004 showed severe central canal stenosis at L4–5 secondary to a broad-based large disc herniation and prominent ligament hypertrophy. (Tr. 365). When conservative measures, such as physical therapy, failed, Plaintiff sought out surgical remediation from Dr. West. (Tr. 263–64). The first surgery was performed on August 25, 2005. (Tr. 206–08).

While Plaintiff had some good initial improvement in his symptoms from his surgery, he continued to have chronic back pain. (Tr. 334–85). Because his pain continued, Plaintiff was seen for pain management at Prime Health Medical Services from February through November 2007, where he received additional physical therapy. (Tr. 274–319). In March 2007, Dr. Gomaa ordered an MRI of the cervical spine, which showed annulus disc bulging from C3 through C7. (Tr. 298). An MRI of the lumbar spine demonstrated a previous laminectomy and fusion involving L4 and L5. There was also an annular disc bulge at L3–4 and L4–5, with facet arthropathy at L5–S1. (Tr. 299).

Because of continued problems, Dr. Smith sent Plaintiff for another cervical spine MRI on February 18, 2008. Broad-based disc herniations were seen at C4–C5, C5–C6 and C6–C7. (Tr. 468). By March 2008, Plaintiff reported chronic neck pain to Dr. Smith. (Tr. 470). When Plaintiff returned to Dr. West on February 1, 2012 for complaints of low back pain with radiation into his hips and buttocks bilaterally, he reported that he did very well after his spinal fusion, however his pain gradually increased over the last two years. (Tr. 712). Dr. West reviewed an updated lumbar MRI, completed on January 25, 2012, and Plaintiff ultimately decided to proceed with a second surgical intervention for his chronic pain on March 26, 2012. (Tr. 711, 702).

The evidence, both prior and subsequent to Dr. Smith's assessment in April 2008, is supportive of the restrictions contained therein. The ALJ committed reversible error by failing to grant controlling weight to Dr. Smith's opinion.

## III.

When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan,* 501 U.S. 89, 100, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).

■ Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir.1994); *see also Abbott v. Sullivan,* 905 F.2d 918, 927 (6th Cir.1990); *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 782 (6th Cir.1987).

■ The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher,* 17 F.3d at 176; *see also Felisky,* 35 F.3d at 1041; *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir.1985). Such is the case here.

Here proof of disability is strong, opposing evidence is lacking in substance, and remand would merely involve the presentation of cumulative evidence and serve no purpose other than delay. As fully recited here, in view of the extensive medical record of evidence of disability, and the credible and controlling findings and opinions of Dr. Smith, the ALJ failed to meet his burden of finding, based on substantial evidence, that Plaintiff was not disabled between December 2, 2004 and January 31, 2011.

### IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner, that Everett Fletcher was not entitled to disability insurance benefits and supplemental security income beginning December 2, 2004, is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE,** and it is **REVERSED;** and this matter is **REMANDED** to the ALJ for an immediate award of benefits. The Clerk shall enter judgment accordingly.