**Kelly J. VORHIS–DEATON, Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant.**

Case No. 3:13–cv–266.

United States District Court, S.D. Ohio, . Western Division.

Signed July 22, 2014.

Gary Marc Blumenthal, Dayton, OH, for Plaintiff.

John J. Stark, US Attorney Office, Columbus, OH, Kiywhanna Lachic Kellup, Social Security Administration Office of General Counsel, Chicago, IL, for Defendant.

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IS REVERSED; (2) JUDGMENT IS ENTERED IN FAVOR OF PLAINTIFF AWARDING BENEFITS; AND (3) THIS CASE IS CLOSED**

TIMOTHY S. BLACK, District Judge.

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge (the "ALJ") erred in finding Plaintiff "not disabled" from August 25, 2005 through January 23, 2012, and therefore not entitled to supplemental security income ("SSI"). (*See* Administrative Transcript at ("Tr.") (Tr. 207–424) (ALJ's decision)).

**I.**

Plaintiff filed an application for SSI on August 25, 2005, alleging disability beginning that same day. (Tr. 61). Plaintiff alleges disability due to borderline intellectual functioning, bipolar disorder, PTSD, and ADHD. (Tr. 409). Plaintiff's application was denied initially and on reconsideration. (Tr. 35, 39). Plaintiff timely requested a hearing, which was held before an ALJ on July 15, 2008. (Tr. 42, 353–94). The ALJ denied benefits in a decision dated September 17, 2008, finding that Plaintiff could perform other work. (Tr. 14–27). The Appeals Council denied review in a decision dated April 1, 2009, making the ALJ's decision the final decision of the Commissioner. (Tr. 5–8). Plaintiff commenced this action for judicial review of the Commissioner's final decision.

The Magistrate Judge (Merz) issued a Report and Recommendation on April 5, 2010, recommending that the "Commissioner's decision that Plaintiff is not disabled and therefore not entitled to benefits under the Act be affirmed." (Tr. 435). He found that Plaintiff did not "satisfy the diagnostic description in the introductory paragraph of Listing 12.05" and that the evidence in the record did not show that Plaintiff's impairments resulted in "deficits in adaptive functioning as required for a diagnosis of mental retardation." (Tr. 434–435). The Magistrate Judge specifically relied on the fact that Plaintiff cared

812

for and raised her two sons, did household chores, drove, and, in the past, worked as a janitor. (Tr. 435).

The District Judge (Rice) rejected the Report and Recommendation, vacated the Commissioner's finding of non-disability, made no finding of fact as to whether or not Plaintiff was disabled, and remanded the case back to the Commissioner for further administrative proceedings. (Tr. 445). The District Judge determined that the ALJ "failed to consider the full extent of Plaintiff's deficits in adaptive functioning, together with her low IQ scores, in combination with her other severe impairments found by the Administrative Law Judge, to wit: asthma, bipolar, a history of attention deficit hyperactivity disorder, and post-traumatic stress disorder." (Tr. 448). The ALJ was ordered to reevaluate Plaintiff's deficits in adaptive functioning, review the entirety of her testimony, have a new administrative hearing, and refer Plaintiff "to a proper mental health professional who can opine on these issues." (Tr. 449–450).

The ALJ conducted a second hearing on June 8, 2012. (Tr. 755). Dr. Mary Buban testified as a medical expert. (*Id.*) The ALJ issued a partially favorable decision on June 25, 2012, in which he found that Plaintiff was disabled as of January 24, 2012, but not prior to that date. (Tr. 423–424).[1] The Appeals Council denied review, making the ALJ's decision the final deci-

sion of the Commissioner. (Tr. 395–397). Plaintiff commenced this action pursuant to 42 U.S.C. Section 405(g) and Section 1383 for judicial review of the Commissioner's final decision.

Plaintiff is 35 years old. (Tr. 26). Plaintiff completed eighth grade.[2] (Tr. 26, 77). Plaintiff does not have any relevant work experience.[3] (Tr. 26).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant has not engaged in substantial gainful activity since the alleged disability onset date (20 CFR 416.971 *et seq.*).

2. Since the alleged onset date of disability, August 25, 2005, the claimant has had the following severe impairments: asthma, bipolar disorder, attention-deficit hyper activity disorder (ADHD), post-traumatic stress disorder (PTSD), borderline intellectual functioning, and cannabis abuse (20 CFR 416.920(c)).

3. Since the alleged onset date of disability, August 25, 2005, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

1. The ALJ relied on Dr. Bonds' opinion to find Plaintiff disabled as of the date of her evaluation, because he found that by that time that Plaintiff's mental condition had worsened because of a lack of treatment, to the point that Plaintiff was disabled. (Tr. 421).

2. Plaintiff tried taking GED classes, but she reported that she was not doing any better with the classes than she did when she was in school. "I work and work and like it don't stay in my head." (Tr. 135). Plaintiff testi-

fied that she took some special education classes. (Tr. 378).

3. Past relevant work experience is defined as work that the claimant has "done within the last 15 years, [that] lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 416.965(a). Plaintiff worked part-time as a custodian in the past, but this work activity did not rise to the level of substantial gainful activity. (Tr. 26).

4. After careful consideration of the entire record, the undersigned finds that, prior to January 24, 2012, the date the claimant became disabled, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) with the following limitations: no climbing of ladders, ropes, or scaffolds; no exposure to concentrated amounts of irritants; no exposure to hazards; no complex or detailed instructions; simple 1–or 2–step tasks (requiring little, if any, concentration); no direct dealing with the general public; low stress work (defined as no production quotas and on over-the-shoulder supervision); limited contact with co-workers and supervisors and no teamwork; and no reading.

5. After careful consideration of the entire record, the undersigned finds that, beginning on January 24, 2012, the claimant has the residual functional capacity to perform the reduced range of medium work set forth in Finding Number 4 above except that she is unable to sustain such work on a regular and consistent basis (*see* Social Security Ruling 96–8p).

6. The claimant has no past relevant work (20 CFR 416.965).

7. Prior to the established disability onset date, the claimant was a "younger individual age 18–49." The claimant's age category has not changed since the established disability onset date (20 CFR 416.963).

8. The claimant has a "limited" education and is able to communicate in English (20 CFR 416.964).

9. Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 416.968).

10. Prior to January 24, 2012, considering her age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 416.969 and 416.969a).

11. Beginning on January 24, 2012, considering her age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy and that claimant can perform (20 CFR 416.960(c) and 416.966).

12. The claimant was not disabled prior to January 24, 2012, but became disabled on that date and has continued to be disabled through the date of this decision. (20 CFR 416.920(g)).

13. The claimant's history of cannabis abuse is not a contributing factor material to the determination of disability. (20 CFR 416.935).

(Tr. 409–423).

In sum, the ALJ concluded that Plaintiff was not under a disability from August 25, 2005 through January 23, 2012, as defined by the Social Security Regulations, and she was therefore not entitled to SSI. (Tr. 423–24).

On appeal, Plaintiff argues that: (1) the ALJ failed to comply with the District Court's remand Order; (2) the ALJ improperly concluded that her IQ scores were invalid; (3) the ALJ erred in finding that she did not have the required deficits in adaptive functioning to meet or equal Listing 12.05; and (4) the ALJ failed to reasonably assess the medical opinions. The Court will address each issue in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir.1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen,* 35 F.3d 1027, 1035 (6th Cir.1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:

Plaintiff had to take the driver's license test by listening to the questions. (Tr. 358). Plaintiff testified that she has difficulty reading a newspaper, especially the bigger words. (Tr. 359).

In October 2003, Plaintiff was evaluated at Advanced Therapeutics. (Tr. 269–70). She was referred by her primary care physician for depression and severe anxiety. (Tr. 269). On mental status examination, her affect was labile, her mood depressed and angry, her speech and stream-of-thought were rapid, and her judgment to manage activities of daily living and make reasonable life decisions was described as "impaired." (Tr. 271). She was diagnosed initially with major depression and a generalized anxiety disorder. (Tr. 270). She was evaluated by psychiatrist, Mahmood Rahman, who observed that she was agitated and had flight of ideas. (Tr. 267). She was diagnosed with a bipolar disorder and began taking Depakote and Lexapro. (Tr. 268). Plaintiff continued to see the psychiatrist at Advanced Therapeutics every four to six weeks through April 28, 2007. Her medications were frequently adjusted. (Tr. 245–65, 272–75). During the first few sessions of treatment, she was often observed to be agitated and labile, with a flight of ideas. (Tr. 262–65).

In January 2006, Alan R. Boerger, Ph. D., evaluated Plaintiff at the request of the state agency. (Tr. 134–40). Plaintiff reported a history of childhood abuse and abuse at the hands of her estranged husband. (Tr. 134). Plaintiff still has flashbacks from the abuse. (Tr. 137). Plaintiff had difficulty working in the past, because she was told that everything she did was wrong. She also reported that she had trouble controlling her anger when she worked. "I can't handle someone screaming at me." (Tr. 135). Plaintiff reported

that she sometimes takes her anger out on others without realizing it. She saw this as "flipping out" on people as a result of mood swings. (Tr. 136).

On examination, Plaintiff could only recall one of four objects after five minutes. She could perform single digit addition, but was incorrect on single digit subtraction, multiplication, and division. She was unable to perform Serial 7's.[4] Plaintiff reported that she needed help from her family to pay her bills. (Tr. 137). IQ testing showed a verbal IQ of 71, a performance IQ of 63, and a full scale IQ of 65.[5] Dr. Boerger noted that the subtest scores fell primarily in the range of mild mental retardation. Results of the Wechsler Memory Scale also fell in the mild mental retardation to borderline range. (Tr. 138).

Dr. Boerger diagnosed Plaintiff with a bipolar disorder, attention-deficit/hyperactivity disorder, posttraumatic stress disorder, and borderline intellectual functioning. Dr. Boerger assigned a Plaintiff a GAF score of 49, which indicates that "her condition has seriously interfered with her everyday functioning." (Tr. 139, 387).[6] Dr. Boerger concluded that Plaintiff was moderately to markedly impaired by a combination of impairments that limited her ability to relate to others, understand and follow directions, maintain attention to perform simple repetitive tasks, and to withstand work stress. (Tr. 139–40).

On February 1, 2006, Dr. Catherine Flynn, a non-examining psychologist, reviewed the file at the request of the state agency. She opined that Plaintiff would be able to function "well enough to perform work which is simple and routine in nature and would do best in a setting that does not require frequent close interaction with others in performance of job duties." (Tr. 143). The reviewer felt that Plaintiff functioned in the borderline range of intelligence, because she was able to complete forms concerning her activities of daily living without assistance and perform activities such as caring for her children and household, which Flynn considered inconsistent with mental retardation. (Tr. 143). Dr. Patricia Semmelman, another non-evaluating psychologist, reviewed the record on May 9, 2006, and affirmed the previous assessment. (PageID 164).

Plaintiff continued treatment with the psychiatrist at Advanced Therapeutics. Her medications continued to be adjusted as needed. (Tr. 320–34). In 2008, she began seeing a therapist who performed a mental status evaluation in February 2008. At that time she was agitated, angry, hurt, and labile. At the time of the evaluation, she had some paranoid ideation and was fearful of the police. She had some auditory hallucinations—she heard voices. Plaintiff's impulse control was rated as poor, her speech was rapid, and her thoughts illogical. (Tr. 328). She was diagnosed with a bipolar disorder, mixed, severe, and chronic posttraumatic stress disorder. (Tr. 327). During treatment sessions, she was described as irritated and frustrated. (Tr. 323, 325).

**4.** Serial sevens, counting down from one hundred by sevens, is a clinical test used to test mental function.

**5.** An IQ score of 50–70 is considered mild mental retardation.

**6.** The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functions of adults. *A score of 41–50 indicates serious symptoms* (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work).

Plaintiff also sought treatment for physical impairments at Corwin–Nixon Health Center. She was observed to be depressed, anxious, shaking, agitated, nervous, and stressed on exams. (Tr. 194, 197, 201, 219, 276). She was treated for anxiety and depression. (Tr. 224, 227)

Medical expert, Georgiann Pitcher, Ph. D., testified at the hearing. She acknowledged that Plaintiff had been diagnosed as mildly mentally retarded, but she did not think that Plaintiff met Listing 12.05, because mild mental retardation was not established before age 22. (Tr. 381–82). Dr. Pitcher acknowledged that Plaintiff had valid IQ scores within the requisite range and her general memory score of 64 was also in the mentally retarded range. (Tr. 382, 384). However, Dr. Pitcher noted that "working memory, which is a measure of what she can do on a task, was a 74 and that's about the same range as her verbal skills." (Tr. 382). Dr. Pitcher felt that Plaintiff functioned more likely in the borderline range of intellectual functioning. (Id.) Dr. Pitcher agreed with the limitations identified by the state agency reviewing psychologist, that Plaintiff would be "relegated to a simple and repetitive task, probably with a one- or two-step instructions verbally and even perhaps hands on." (Tr. 383). Dr. Pitcher noted that Plaintiff could not handle written instructions, and due to anxiety in social situations, could not "deal with the public." (Id.) She also agreed that Plaintiff should not be required to engage in any teamwork. (Id.) On cross-examination, Dr. Pitcher agreed that records from Advanced Therapeutic Services showed that Plaintiff's medications had been increased, and noted that they would be increased if "the amount that they had originally prescribed was not controlling the symptoms...." (Tr. 387).

Interrogatories were completed by Dr. Rama Gollamudi, Plaintiff's treating psychiatrist, on June 14, 2007. Dr. Gollamudi reported that he had treated Plaintiff since November 2004. (Tr. 335). Dr. Gollamudi diagnosed Plaintiff with bipolar disorder and anxiety disorder. (Tr. 336). Plaintiff was unable to be prompt and regular in attendance; respond appropriately to supervision, co-workers, and customary work pressures; sustain attention and concentration on her work to meet normal standards of work productivity and work accuracy; behave in an emotionally stable manner; relate predictably in social situations; demonstrate reliability; maintain concentration and attention for extended periods; complete a normal workday or workweek without interruption from psychologically and/or physically based symptoms and perform at a consistent pace without unreasonable numbers and length of rest periods; get along with co-workers or peers without unduly distracting or exhibiting behavior extremes; and work in coordination with, or in proximity with others without being unduly distracted by them. (Tr. 338–343). Dr. Gollamudi also found that Plaintiff had moderate deficiencies of concentration, persistence, or pace that resulted in a failure to complete tasks in a timely manner. (Tr. 344).

Additional medical records were submitted after the Court's remand. Plaintiff was hospitalized from August 3, 2010 through August 5, 2010 after a seizure during Xanax withdrawal. She had run out of her Xanax three days prior and had a seizure at home. (Tr. 523). Her Xanax was restarted and she was discharged. (Tr. 524). While urine toxicology tests were positive for amphetamine, benzodiazepine, and opiates, she was not diagnosed as being a drug abuser. (Tr. 523, 532).[7]

7. Xanax is a bensodiazpine. Plaintiff was also given Ativan in the hospital, which is also a benzodiazepine. (Tr. 528).

Plaintiff continued treatment at Advanced Therapeutic Services from July 2, 2008 through February 15, 2011. Her medications were often changed and/or increased or decreased. (Tr. 608–654). On June 19, 2010, it was noted that Plaintiff lived with her mother, step-father, and two children. (Tr. 617, 626). At times, her symptoms improved. (Tr. 608, 630, 634, 636, 642, 644, 647–48, 651–52). However, any such improvement was short-lived. (Tr. 609–13, 615, 622, 631–33, 635, 637–41, 643, 645–46, 649–50, 653). During evaluations, she was observed to be angry and anxious. (Tr. 609, 611, 612–13, 615, 622, 627). She was discharged because of a change in insurance. (Tr. 608). On March 11, 2009, Dr. Gollamudi completed a Basic Medical Form. He stated that she had mood swings, anger, insomnia, and anxiety. Plaintiff's condition was poor but stable. (Tr. 667). Dr. Gollamudi found Plaintiff to be markedly impaired in her ability to understand and remember detailed instructions, in her attention and concentration, in her ability to work in coordination with others without unduly distracting them; in her ability to respond appropriately to criticism from supervisors; in her ability to get along with co-workers without unduly distracting them or exhibiting behavioral extremes; and in her ability to set realistic goals or make plans independently of others. (Tr. 669). He found Plaintiff was unemployable for twelve months or more. (Tr. 668, 670).

Plaintiff's treating family doctor, Dr. Kwasi Nenonene, completed interrogatories on December 13, 2011. Dr. Nenonene stated that he had treated Plaintiff since February 4, 2009. (Tr. 676). She was seen for low back pain, right shoulder pain, anxiety, and depression owing to a bipolar disorder, restless leg syndrome, and asthma. Dr. Nenonene stated that Plaintiff

had "[m]arked deficit in her physical and emotional abilities which will have marked effect on her ability to work and function in a social sitting. (Tr. 678). She was unable to perform any of the mental activities needed for work. (Tr. 679–684). She was moderately impaired in her daily activities, extremely impaired in her social functioning, and extremely impaired in her concentration, persistence, or pace. (Tr. 684–685). After Plaintiff stopped treatment at Advanced Therapeutics, Dr. Nenonene treated her for anxiety, depression, ADHD, and bipolar disorder. (Tr. 686–89, 691). On July 13, 2011, Dr. Nenonene planned to refer her to a psychiatrist for further evaluation. (Tr. 690).

Dr. Giovanni Bonds evaluated Plaintiff on January 24, 2012, at the request of the state agency. (Tr. 701). Plaintiff related that she had lived with her mother for the past three years because she could not keep her own place and take care of her oldest son who was mentally handicapped. Both of her sons were "out of control and abusive to her." (Tr. 702). She did not have friends and was not involved in any social activities. (Id.) She dropped out of school in the eighth grade because the other children made fun of her. Plaintiff was receiving mental health treatment from her family doctor because Advanced Therapeutics stopped taking her insurance, but she was on a waiting list at another mental health center. (Tr. 703).

Dr. Bonds observed that Plaintiff was nervous, tense, and depressed. She had a fearful expression. (Tr. 704). Plaintiff was partially oriented to date and place, but she did not know the name of the President. She could not name the months either backwards or forwards, or do any arithmetic problems. Her cognitive abilities were judged to be in the

extreme low range, between 60–70. Plaintiff got up at 4:00 a.m. and then got her children up at 5:20 a.m. to go to school. After they left, Plaintiff helped her mother clean the house. She sometimes cooked, shopped, drove, and did laundry. She had a computer, but did not know how to use it. (Tr. 705–06). Dr. Bonds diagnosed bipolar I disorder, most recent episode mixed and mild mental retardation. Plaintiff's GAF score was 50. (Tr. 707). Dr. Bonds found that Plaintiff would have marked restrictions in her ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions; interact appropriately with the public, supervisors, and co-workers; and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 709–10).

### B.

▮ First, Plaintiff maintains that the ALJ failed to comply with the District Court's remand Order.

▮ The District Judge stated that "[w]hile the Plaintiff's IQ scores are deemed to be valid, as conceded by the Defendant Commissioner, the Administrative Law Judge failed to consider fully her deficits in adaptive functioning." (Tr. 448).[8] Plaintiff argues that the ALJ improperly revisited the validity of her IQ score.

Defendant maintains that the ALJ did not question the validity of the IQ testing, rather he questioned whether Plaintiff's IQ scores were indicative of her actual functioning. While it appears that the ALJ focused in part on Plaintiff's IQ scores, there is no indication that the ALJ declared the IQ scores invalid. Moreover, Dr. Boerger merely diagnosed Plaintiff with borderline intellectual functioning, and Dr. Buban agreed that Plaintiff did not have any form of mental retardation (Tr. 411, 413, 795).

Accordingly, Plaintiff fails to evidence that the ALJ did not comply with the District Court's remand order.

### C.

▮ Next, Plaintiff argues that the ALJ failed to reasonably assess the medical opinions.[9]

On March 11, 2009, Dr. Gollamudi, Plaintiff's treating psychiatrist, who had

---

**8.** Judge Rice also found that the ALJ had "cherry pick[ed] bits and pieces of the Plaintiff's testimony as to her daily activities … rather than considering the entirety of Plaintiff's testimony." (Tr. 411–414). An ALJ cannot simply "pick and choose" evidence in the record "relying on some and ignoring others, without offering some rationale for his decision." *Young v. Comm'r of Soc. Sec.,* 351 F.Supp.2d 644, 649 (E.D.Mich.2004).

**9.** The treating physician rule requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because:

These sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir.2009).

The regulations state:

Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

20 C.F.R. § 404.1527(d)(2)(i).

treated Plaintiff since November 2004, opined that Plaintiff was unemployable for twelve months or more. (Tr. 668). Specifically, he found her markedly impaired in her ability to understand and remember detailed instructions, in her attention and concentration, in her ability to work in coordination with others without unduly distracting them; in her ability to respond appropriately to criticism from supervisors; in her ability to get along with co-workers without unduly distracting them or exhibiting behavioral extremes; and in her ability to set realistic goals or make plans independently of others. (Tr. 669).

However, the ALJ found that Dr. Gollamudi's opinion was not supported by medical records. For example, the ALJ suggests that Plaintiff's medications were effectively controlling her symptoms. (Tr. 419). Yet Plaintiff's treatment records show that her medications were frequently adjusted or changed. (Tr. 245–65, 272–75, 320–34, 608–654). At times Plaintiff's symptoms improved, but such improvement was often short-lived. (Tr. 608, 609–13, 615, 522, 630–653). Dr. Gollamudi's findings are further supported by 2008 therapist findings that Plaintiff was paranoid, had poor impulse control, rapid speech, and flight of ideas. (Tr. 327–28, 262–65, 323, 325). Additionally, on December 13, 2011, Plaintiff's family doctor, Dr. Nenonene, found that Plaintiff had "[m]arked deficit in her physical and emotional abilities which will have marked effect on her ability to work and function in a social sitting." (Tr. 678). Specifically, she was unable to perform any of the mental activities needed for work because she was extremely impaired in her concentration, persistence, or pace. (Tr. 679–685). As her treating physicians, Drs. Gollamudi's and Nenonene's opinions

were entitled to controlling weight, because their opinions were supported by the overwhelming evidence.

Even Dr. Boerger, Defendant's consulting psychologist, found that Plaintiff could only recall one of four objects after five minutes, should not perform single digit subtraction, multiplication, or division, and needed help from her family to pay bills. (Tr. 137). Dr. Boerger noted that Plaintiff's scores fell primarily in the range of mild mental retardation. (Tr. 138). He concluded that Plaintiff was moderately to markedly impaired by her combination of impairments. (Tr. 139–140). It was improper for the ALJ to reject Dr. Boerger's opinion because he only examined Plaintiff once, but then to adopt Dr. Buban's opinion, even though he never examined her. The ALJ explained that he did not credit Dr. Boerger's opinion because it was inconsistent with treatment notes from Advanced Therapeutic Services. (Tr. 418). Specifically, a week after Dr. Boerger issued her opinion, Plaintiff's doctors noted that her symptoms improved and she was stable on medication. (Tr. 245).[10] However, evidence of improved mental health symptoms does not render Dr. Boerger's opinion inconsistent with the medical evidence. The evidence shows that Plaintiff's symptoms often improved, but that such improvement was often short-lived and that her medications were frequently changed and adjusted. (Tr. 245–65, 272–75, 320–34, 608–654).

All told, the Court finds that the ALJ erred in failing to properly weigh the opinions of Plaintiff's treating physicians, Drs. Gollamundi and Nenonene.

### D.

■ Finally, Plaintiff claims that the ALJ erred in finding that she did not have

10. 20 C.F.R. § 404.1527(d)(4) ("Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion.").

the required deficits in adaptive functioning to meet or equal Listing 12.05.

██ For a claimant to show that her impairment matches an impairment in the Listings, she must meet *all* of the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Additionally, the claimant must prove that the disability lasted for a continuous period of not less than 12 months to meet the Listing. 42 U.S.C. § 423(d)(1)(A). "[I]t is the claimant's burden to show that he meets or medically equals an impairment in the Listings." *Todd v. Astrue*, No. 1:11cv1099, 2012 WL 2576435, at *9, 2012 U.S. Dist. LEXIS 91992, at *9 (N.D.Ohio May 15, 2012). "In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing. It is insufficient that a claimant comes close to meeting the requirements of a listed impairment." *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

Listing 12.05 requires a finding of disability based on the claimant's intellectual disability:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when ... (C) [the claimant has demonstrated] a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.05(C). A claimant must establish three elements in order to satisfy Listing 12.05(C):

(1) that she experiences "significantly subaverage general intellectual functioning with deficits in adaptive functioning[11] [that] initially manifested during the developmental period" (*i.e.*, the diagnostic description);

(2) that she has a "valid verbal, performance, or full scale IQ of 60 through 70;" and

(3) that she suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

The question before the Court is whether Plaintiff established deficits in adaptive functioning. According to the Diagnostic and Statistical Manual of Mental Disorders, adaptive functioning refers to "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Am. Psychiatric Assn, Diagnostic & Statistical Manual of Mental Disorders, 42 (4th ed., Text Rev.2000).

---

**11.** Loss of adaptive functioning is "manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R., Pt. 404, Subpt. P, App. 1 at Section 12.00(C)(4). *See also West v. Comm'r of Soc. Sec.*, 240 Fed.Appx. 692, 698 (6th Cir.2007) ("Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills."). Plaintiff must evidence deficits in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, and health and safety. DSM–IV, 46 (4th ed.2000).

Dr. Buban, the medical expert at the June 8, 2012 hearing, concluded that Plaintiff was able to comprehend and express information, perform activities of daily living, interact appropriately with others, take care of her health and safety and obtain proper medical treatment. (Tr. 799). In particular, Dr. Buban noted that Plaintiff interacted with her children and previously held a babysitting job.[12] (Tr. 799–800).

In January 2006, Plaintiff told Dr. Boerger that she did "all" the cooking, cleaning and laundry. (Tr. 137). She reported similar abilities in March 2006, when she completed her function report. (Tr. 111–13). Other than mopping and lifting heavy things, Plaintiff did not indicate that she needed assistance with the household chores. (Tr. 113). In fact, she admitted that she took care of her activities of daily living, prepared meals by herself, and shopped by herself. (Tr. 112).[13] Accordingly, it was reasonable for Dr. Buban to conclude that Plaintiff had only mild to moderate limitations in activities of daily living from January 2006–March 2006. (Tr. 790).

However, Plaintiff later testified that she required help from her mother everyday with her children, shopping, and cooking.[14] (Tr. 735–742). Specifically, Plaintiff needed her sister to help with her chil-

dren's homework and either her mom or stepdad to help with paperwork from the school. (Tr. 742). In fact, by the time of the second hearing, Plaintiff had actually moved in with her mother, so that she could help Plaintiff with her children. (Tr. 759, 770). Plaintiff also testified that she tried to get her GED three times and failed (Tr. 760, 781), and that she had to take the driver's test three times orally (Tr. 782).

Accordingly, the Court finds that substantial evidence establishes that Plaintiff had significant deficits in adaptive functioning as of March 11, 2009, the date of Dr. Gollamudi's opinion (no past relevant work history, IQ score below 70, requires help completing paperwork, and unable to independently shop and manage money). (Tr. 373). Substantial evidence does not substantiate any other finding. Plaintiff's deficits in adaptive functioning, together with her IQ scores, in combination with her other severe impairments (asthma, bipolar, a history of attention deficit hyperactivity disorder, and post-traumatic stress disorder), meet or equal Listing 12.05. (Tr. 448).

## III.

When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide

**12.** The record indicates that Plaintiff was unable to care for her own children without help from her mother. Even if Plaintiff was, at one time, able to do certain activities, like babysitting, there is no indication that Plaintiff could do any of these activities on a sustained basis. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 380 (6th Cir.2013). Plaintiff was not even able to maintain a part-time job as a janitor. (Tr. 26).

**13.** The facts that a claimant could use public transit, obtain a driver's license, visit friends, make change at a grocery store, do his own laundry and clean his room, were not incon-

sistent with a valid IQ score of 68. *Brown v. Sec'y,* 948 F.2d 268, 269 (6th Cir.1991).

**14.** At the June 2008 hearing, Plaintiff explained that she needed assistance because her children had mental disabilities. (Tr. 364). She said that both of her children had "ADHD and bipolar ...., so it's hard to for me to deal with both of them at the same time." (*Id.*) Accordingly, it is unclear whether Plaintiff's child rearing difficulties are related to her children's impairments or to her own intellectual and cognitive difficulties. (Tr. 413).

whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan,* 501 U.S. 89, 100, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).

 Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir.1994); *see also Abbott v. Sullivan,* 905 F.2d 918, 927 (6th Cir.1990); *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 782 (6th Cir.1987).

The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher,* 17 F.3d at 176; *see also Felisky,* 35 F.3d at 1041; *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir.1985). Such is the case here.

Here proof of disability *is* overwhelming and remand will serve no purpose other than delay. As fully recited here, in view of the extensive medical record evidencing disability, and the credible and controlling findings and opinions of Drs. Gollamudi and Nenonene, the ALJ failed on the evidence and the law in finding substantial evidence that Plaintiff is able to engage in substantial gainful activity. Instead, proof of disability is overwhelming.

### IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner, that Kelly Vorhis–Deaton was not entitled to supplemental security income, is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE,** and it is **REVERSED;** and this matter is **REMANDED** to the Commissioner for an immediate award of benefits from March 11, 2009–January 23, 2012. The Clerk shall enter judgment accordingly, and this case shall be **CLOSED.**

**IT IS SO ORDERED.**